Filed 11/22/21  P. v. Luna CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JULIAN JUNIOR LUNA et al.,<br><br>    Defendants and Appellants. | F077054<br><br>(Super. Ct. Nos. CRM032204B & CRM032204E)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Mark V. Bacciarini, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant Julian Junior Luna.

Mark Alan Hart, under appointment by the Court of Appeal, for Defendant and Appellant Arturo Morfin.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Melissa Lipon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

## I. Procedural History

Following the fatal, gang-related shooting of Francisco Pena,[1] coappellants Julian Junior Luna and Arturo Morfin were charged with first degree murder that was willful, deliberate, and premediated and perpetrated by means of lying in wait (Pen. Code, §§ 187, subd. (a), 189, subd. (a); count 1).[2]  The information further alleged murder special-circumstances of lying in wait and active gang participation (§ 190.2, subd. (a)(15), (22)), a firearm enhancement (§ 12022.53, subds. (d), (e)(1)), and a gang enhancement (§ 186.22, subd. (b)(5)).  In connection with a shooting that occurred four days earlier and injured Francisco's young nephew, Morfin was also charged with shooting at an occupied vehicle (§ 246; count 2) with attached firearm and gang enhancements (§§ 12022.53, subd. (d), 186.22, subd. (b)(4)); and assault with a firearm (§ 245, subd. (a)(2); count 3), with attached firearm, personal infliction of great bodily injury (GBI), and gang enhancements (§§ 12022.5, subd. (a), 12022.7, subd. (a), 186.22, subd. (b)(1)(C)).  As to Morfin, the information alleged he suffered one prior serious or violent felony conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and alleged, based on the same conviction, a prior serious felony conviction enhancement (former § 667, subd. (a)(1)) and a prior prison term enhancement (former § 667.5, subd. (b)).[3]

The jury convicted Luna and Morfin as charged and found the premeditation and lying in wait allegations, the murder special-circumstance allegations, and the sentence

---

[1]  In this case, several involved parties share the same last name.  Therefore, in some instances, we refer to individuals, including Francisco, by first name.  No disrespect is intended.

[2]  All further statutory references are to the Penal Code unless otherwise stated.

[3]  The amendments to former section 667, subdivision (a)(1), and former section 1385, subdivision (b), are discussed in part II.B.3. of the Discussion.  (2017–2018 Reg. Sess.; Senate Bill No. 1393.)  Section 667.5, subdivision (b), was amended effective January 1, 2020, to limit the convictions upon which a prior prison term enhancement may be based (2019–2020 Reg. Sess.; Senate Bill No. 136); and effective January 1, 2022, section 1171.1 was added to the Penal

enhancement allegations true. In a bifurcated proceeding, the trial court found the prior conviction and prison term allegations against Morfin true.

On count 1, the trial court sentenced Luna and Morfin each to a term of life without the possibility of parole for murder and an additional, consecutive term of 25 years to life for the firearm enhancement. On count 2, the court sentenced Morfin to the upper term of seven years for shooting at an occupied vehicle, doubled to 14 years for the prior strike conviction, plus additional, consecutive terms of 25 years to life for the firearm enhancement, 15 years to life for the gang enhancement, and five years for the prior serious felony conviction enhancement.[4] On count 3, the court sentenced Morfin to the upper term of four years for assault with a firearm, doubled to eight years, plus additional terms of 10 years for the firearm enhancement, three years for the GBI enhancement, and 10 years for the gang enhancement. The sentence on count 3 was stayed under section 654.

## II.    Appellate Claims

On appeal, Luna claims that given the inflammatory nature of the charges against Morfin for shooting a child, the trial court erred when it denied his motion to sever his trial from Morfin's. He also claims, joined by Morfin, that the trial court erred under state law when it admitted Francisco's brother's statement that Francisco said he was going to meet with Lazy the night he was killed. Relatedly, Luna claims admission of that statement also violated the confrontation clause of the Sixth Amendment; and the trial court erred when it denied his motion for a mistrial, brought after the prosecutor's

---

Code to provide that any sentence enhancement imposed under that section prior to January 1, 2020, except for those qualifying sexually violent offenses, is legally invalid (Sen. Bill No. 483 (2021-2022 Reg. Sess.) ch. 728, § 3). In this case, the trial court did not impose the one-year prior prison term enhancement, but Morfin's prior assault conviction is no longer a qualifying offense and, therefore, we shall order the finding stricken.

[4]     As discussed in part II.B.4. of the Discussion, there were several errors with Morfin's sentence.

direct examination of Francisco's brother regarding Francisco's statement contravened the in limine ruling. Lastly, Luna claims that admission of cumulative, prejudicial, and irrelevant evidence violated his constitutional right to a fair trial, and that his murder conviction is not supported by substantial evidence.

Morfin claims his Sixth Amendment right of confrontation was violated by the admission of Detective Sanchez's testimony that he had information Morfin confessed involvement in shooting a child to other gang members. Joined by Luna, Morfin also seeks remand under Senate Bill No. 620 (2017–2018 Reg. Sess.; Senate Bill No. 620), effective January 1, 2018, on the ground that the record is silent regarding whether the trial court understood it had discretion to strike the firearm enhancements, and he claims imposition of the 25-year-to-life firearm enhancement on count 1 was improper double punishment given his murder sentence. Finally, Morfin seeks remand under Senate Bill No. 1393, effective January 1, 2019, to allow the trial court to exercise its discretion regarding whether to strike the five-year prior serious felony conviction enhancement imposed under former section 667, subdivision (a)(1), and he claims the court erred in doubling the enhancement to ten years on count 2.

The People concede that Morfin is entitled to remand under Senate Bill No. 1393 and that the trial court erred in doubling the prior serious felony conviction enhancement on count 2, but they otherwise dispute Luna's and Morfin's entitlement to any relief on their claims.

We affirm Luna's judgment.

Morfin is entitled to remand under Senate Bill No. 1393. In addition, as explained in part II.B.4. of the Discussion, the trial court erred in its imposition of sentence on count 2, necessitating remand for resentencing under the penalty provision in section 186.22, subdivision (b)(4). Morfin's judgment is otherwise affirmed.

## I. Prosecution Case

### A. Background

In the early 1990's in the town of Winton, teenaged brothers Francisco and Jose P., along with a group of their friends, founded the Winton Varrios Parque (WVP) street gang and Sureño subset. At the time of Francisco's murder, Jose, known as "Locs," and Francisco, known as "Spooks," remained committed to and active in the gang, and they were respected senior leaders. Jose testified that as they aged, however, they were less interested in going out looking for trouble.

Luna, known as "Lazy," and Morfin, who went by both "Mato" and "Art," were younger and ran with a different group in WVP.[5] Jose did not view Morfin as an "influential person in the neighborhood," and approximately three years before Francisco's murder, bad blood developed between the two after Jose's release from prison. Jose testified that on the day he arrived home, Morfin came over and started talking about getting the neighborhood more organized and setting up a "mesa," or table, to call shots. Jose was not interested in talking about what he considered "prison politics" while out on the streets. He told Morfin he did not want to deal with it and just wanted to enjoy life, and he warned Morfin to stop talking about it or there would be a fight. After Morfin persisted, Jose hit him and the two fought until others broke it up.

Jose testified Morfin was angry with him after that, because Morfin felt Jose was disrespecting him in front of the younger gang members. They fought physically two additional times. The second time, Jose and another person ran into Morfin, who was also with someone else, at the liquor store. Jose testified he might have called Morfin a punk and they started fighting. When Jose gained the upper hand, Morfin asked the other

---

[5] Luna and Morfin were both 24 years old at the time of Francisco's murder.

men there to get Jose off of him. They had further words and then went their separate ways.

Following that fight, Morfin gave Jose dirty looks when they encountered one another around town. Jose made it known that Morfin was acting up when Jose was out with his family and Jose was looking to fight Morfin "'heads up and one on one'" so Morfin would get the message to leave Jose alone around his family. Jose never had any issues with Luna, his brother Fernando Luna, or anyone else in the neighborhood other than Morfin, but Luna and Fernando hung around with Morfin and "[t]hey had their own little group."

Morfin and some members of his group lived in an apartment complex on Myrtle Street, known and referred to as "'[t]he Block'" throughout trial.[6] Although Jose only lived a block away and Francisco lived next door, neither hung out at the Block.

The third fight occurred when Francisco asked Jose to take him to the Block, possibly to buy weed. Jose stayed in the car, but Morfin opened his front door and looked at Jose. Jose rolled down his window, asked Morfin if he was ready, and got out of the car. Morfin came at Jose, who hit Morfin, dropped him, and "started hammering away." After others broke it up, Morfin went back inside and came out acting like he had a gun, although Jose did not see one. Morfin threatened to shoot, and Francisco started arguing with him. Others present calmed things down, and someone said Morfin was just mad because he got a beating. Francisco and Jose then left.

### B.     Oscar's Shooting

Although they were not a couple, Jose and Vanessa had a two-year-old son, Oscar, together. On December 19, 2013, four days before Francisco was killed, Oscar was taken to the hospital with a gunshot wound to his buttocks. He remained hospitalized for a day

---

[6]     Fernando, known as "Bones," lived in apartment No. 2; Morfin lived in apartment No. 4; and Alejandro Fierro, known as "Danger," lived in apartment No. 5.

or two.  At that time, Vanessa was affiliated to some degree with A-Town, a Sureño gang based in Atwater and a rival of WVP.  Vanessa's then-boyfriend, Erick, was an A-Town member and was driving with Oscar in his car when the shooting occurred.

At the hospital, Vanessa gave a statement to an Atwater Police officer.  Approximately four months later, she was interviewed at her apartment by Detectives Sanchez and Ruiz with the Merced County Sheriff's Department.  By then, five men had been arrested in connection with Francisco's murder and detectives theorized Oscar's earlier shooting might be connected.  Shortly thereafter, Erick was also interviewed by Sanchez.

### 1.    Erick's Testimony

Erick testified with obvious reluctance.  He told the jury that he had just dropped Vanessa off at a gas station in Atwater and was driving with Oscar in the car when he heard a bang he thought was a firework.  He did not recall where he was at the time and he denied seeing anyone, seeing any vehicles he recognized, or seeing a green car.  He said he took Oscar home and then, after he picked Vanessa up along the way, he drove to the hospital because Oscar was crying.  He did not check Oscar for injuries or contact the police and he did not see any blood, holes in Oscar's clothing, or damage to his car.

Erick conceded A-Town is a Sureño gang, but denied knowing any details about it, denied knowing what WVP was, and denied any gang involvement, including in A-Town.  He described the tattoo of three dots under his eye as "Lucky 13," a non-gang related "clothing symbol or something."  He recalled speaking with a detective at the parole office, but denied he told the detective he was an active A-Town member, even after the prosecutor provided his statement to refresh his recollection.  Erick denied knowing Francisco, Morfin or Luna, and he stated he had never seen Morfin or Luna before.  He knew who Jose was, but said he saw Jose for the first time at the hospital after the shooting and he did not know if Jose was gang affiliated.  Erick testified he did not know who shot at his car and he did not know if Oscar was the intended target, and he

denied telling Vanessa that he saw Morfin in a green car or that Morfin was the shooter. He also denied telling Jose at the hospital that Morfin was the shooter.

Detective Sanchez testified that when he interviewed Erick, Erick was hesitant to talk because he was an active A-Town member and had safety concerns. Although Erick did not provide a name, he told Sanchez that Oscar's shooter was in custody for Francisco's murder and Oscar was not the target.[7] After Sanchez informed Erick he had spoken with Vanessa, Erick said that Sanchez already knew everything and that everything Vanessa told him was true. Erick denied making those statements at trial, but said he told Sanchez the truth when interviewed.

### 2. Vanessa's Testimony

Vanessa, who also testified reluctantly, denied her family was gang affiliated, but said her brother was an active A-Town Sureño. She also said Erick was an active A-Town member at the time of the shooting, but was not involved anymore, and she considered both Erick and her brother family men.

The day Oscar was shot, Vanessa planned to carpool to work with Erick's sister and they met at the gas station. Erick dropped her off and drove off with Oscar. After Erick's sister gassed up the car and they left, Vanessa saw Erick driving back toward them, waving them over. Oscar was crying and although Erick did not say Oscar had been shot, Vanessa saw he was bleeding from a hole in his buttock. Erick's sister drove Vanessa and Oscar to the hospital. Erick and Jose both arrived later.

Vanessa denied she told Jose at the hospital that one of his "homeboys" shot Oscar. She also denied she told detectives she found a bullet in Erick's car, denied she knew Morfin or anything about a green car, and denied Erick said anything about a green car. After Vanessa stated she did not recall what she said during her interview with

---

[7] At that time, Luna, Morfin, Fernando, Ricardo Romo, and Elias Vera were in custody for the murder of Francisco. Fernando, Romo, and Vera later pled guilty to voluntary manslaughter.

Detectives Sanchez and Ruiz, excerpts from the recorded interview were played for the jury. During the interview, employing what he later described as a ruse, Sanchez told Vanessa that one of the people arrested for Francisco's murder confessed to shooting Oscar.

Although Vanessa was reluctant to cooperate throughout the interview, she was also concerned about losing custody of her son and was upset he was shot. She told detectives that when Erick dropped her off at the gas station, the person who shot Oscar was gassing up his green car at the station across the street. He was by himself and she recognized him. As he drove past, he looked at her "crazy." Vanessa did not see the shooting or hear any gunshots, but after she departed from the gas station and Erick waved her down, she saw a bullet in the backseat of his car. She said Erick told her the green car shot at him, and there was only one green car on the street. Vanessa then selected Morfin from the six-photo lineup presented and stated she knew him as Arthur.

### 3. Jose's Testimony

Although A-Town and WVP were both Sureño subsets, Jose testified they had a "nasty" rivalry in December 2013, and they had "'green light[s]'" on one another, which meant an order or an expectation to attack or shoot rivals on sight. After Jose arrived at the hospital, Vanessa told him repeatedly that his "'homeboy with a green car'" shot Oscar. Jose also spoke with Erick, and after he pressed Erick about Vanessa's statement that one of his homeboys shot Oscar, Erick said the shooter was "'Art.'"

### C. Francisco's Murder

### 1. Summary of Shooting

On December 23, 2013, Francisco and his girlfriend, M.S., were shopping at Walmart. While there, they ran into J.V. and his girlfriend, A.V. Jose described J.V. as "a hang-around" who always "chauffeur[ed]" Romo and Elias Vera around. Francisco and J.V. shook hands. Francisco and M.S. checked out around 5:35 p.m. and went to watch a friend's children's karate class.

9.

While there, Francisco stepped out to take an incoming cell phone call. At 6:52 p.m., Francisco called Jose, sounding upset and confused. After the murder, Jose told Detective Sanchez that Francisco said he was meeting Lazy.

M.S. testified that prior to leaving the karate class to take the phone call, Francisco was happy, but when he returned, he was "very serious, sad, or quiet." Francisco told M.S. that they had to go home. At the corner of Winton and Myrtle, Francisco directed M.S. to stop the car. He got out and told M.S. to go home, which was nearby on Myrtle. M.S. drove home and parked. She then heard numerous gunshots and called Francisco's phone, but there was no answer.

The jury heard three calls to 9-1-1 reporting shots fired. One of callers, who lived nearby, reported hearing someone jump the fence and then gunshots. Another caller who lived in the apartment next to Morfin's reported hearing 15 to 20 high-powered gunshots and, at the scene, she told law enforcement she thought she heard someone on the roof and people might have been shooting from up there. Deputies were dispatched to the scene around 7:15 p.m.

Francisco's body was found on the ground in the rear of the Block between the property line fence and the apartment building, consistent with him having just jumped the fence. He had a nine-millimeter gun tucked in his waistband and had been shot three times. The fatal shot, which entered his upper back at the base of his neck and exited through his chest, severed his spinal cord and paralyzed him. The shot traveled downward and was consistent with being fired from the roof. The other two shots went through his left forearm and left thigh. The pathologist was unable to determine whether the shots came from the same or different firearms, but he opined they did not come from a shotgun due to the absence of pellets.

On the roof, Detective Ruiz located a round hole in the tarp over the air conditioning unit above Morfin's apartment, and, along the same trajectory, a hole in the roof, the fascia board, and the rain gutter consistent with a bullet hole. Following the

trajectory to the ground, Ruiz located a bullet hole in the fence and then a bullet lodged in the dirt.

Although no firearms linked to the shooting were ever recovered, law enforcement officers located three spent Winchester-brand 12-gauge shotgun shells; 10 spent Fiocchi-brand 7.62 by 39-millimeter caliber rifle casings, four in the backyard of apartment No. 5 in the vicinity of Francisco's body and six in the backyard of apartment No. 4; and an unspent Luger nine-millimeter bullet in front of apartment No. 1. Inside apartment No. 4, leased by Morfin, officers located a gun cleaning kit and a blue latex glove with four 12-gauge shotgun shells in the fingers, among other items.

### 2. Investigation

#### a. Events Prior to Shooting

After Francisco's murder, Jose told Detective Sanchez that Francisco was going to meet Lazy, as previously stated, and investigators began piecing together the events of that night through interviews and phone records. J.V. was interviewed by detectives several times and testified at trial, reluctantly. In his testimony, he said he did not recall receiving a call from someone with an unknown number asking for Francisco's number, although he told the police he did; he did not think Morfin called while he was at Walmart; and he did not have Francisco's number. He also claimed he was not familiar with A-Town, did not know anyone in WVP, did not know Luna or Morfin, and did not know anyone who lived at the Block. He denied he made contrary statements to detectives and said he was panicked at the time because he was trapped inside a patrol car and scared of going to jail.

Excerpts of J.V.'s statement to Detectives Ruiz and Macias were played for the jury. In his interview, J.V. said he was not affiliated with WVP except to the extent he hung around with members, and he expressed fear he would be killed for talking. J.V. was aware of "the beef" between A-Town and "the park," but said he was not really

11.

involved with any of it.  He also said Francisco "had love for everyone" and treated him "like a son."

J.V. stated that Morfin was angry with Francisco and Jose, and Morfin "wanted to control the park."  A year prior to the murder, J.V. went to the Block with Francisco. There, Francisco and Jose each fought and bested Morfin to "squash[] the beef." Subsequently, months before the murder, J.V. heard Morfin talking about "wiping some homies out" for "being drop outs or some shit," and Morfin specifically mentioned Francisco.  J.V. had just arrived at the time, and Fierro looked at him and then told Morfin they would talk about it later.

In his statement, J.V. said that on the day of Francisco's murder, he received a call at around 12:00 from someone with a deep voice repeatedly asking for Francisco's number, which scared him.  At 3:00, Morfin called and asked for Francisco's number. Francisco did not want J.V. giving out his number and J.V. did not like Morfin, so he said he lost his phone contacts but gave Morfin the number for his cousin, Vera.

At trial, A.V. denied that J.V. hung around with gang members or talked about gang stuff.  However, she said that just prior to running into Francisco at Walmart, J.V. received a phone call from someone asking for Francisco's number.  J.V. said he did not have it and, as they were checking out, J.V. received another phone call from someone asking for Francisco's number.  J.V. again said no, but told the caller he had just seen Francisco in the store.  A.V. testified she did not know who called but during her police interview that was played for the jury, she said one of the two incoming calls showed the name Art, although she did not remember which call.

At 6:54 p.m., someone sent a text message from Denise D.'s cell phone to Fierro's cell phone asking, "They wanna knoe if its coo to come inside and watch the game.  Lazy lucky and esgar."  Someone texted in response, "Yeah if they help you clean."

At trial, both Denise D. and Fierro disclaimed any recollection of sending or receiving those texts.  Denise was at the Block inside Fierro's apartment that night and

12.

she acknowledged she hung out with WVP members, but she said her cell phone was not password protected, it was on the kitchen table charging, and other people always grabbed her phone and used it. She said there were two or three other people inside Fierro's apartment with her, but she did not know them and did not really interact with them. Fierro was not there, she did not recall if Romo was there, and she denied knowing Morfin, Luna or anyone named Lazy. She also denied she knew Fernando, although she recognized him from a photograph and knew his girlfriend, Alma M.

Denise testified she was watching football inside Fierro's apartment when she heard gunshots. When she left shortly thereafter, it was quiet outside and no one was around. She later found out about the murder.

Fierro testified he used to be active in WVP, but was not anymore. Francisco had been a roommate of his in the past and he also knew Jose, Morfin, and Luna. However, he said he "barely" knew Morfin and Luna because he had been in prison, he did not know if they were involved in WVP, and he did not recall seeing any fights, including between Jose and Luna or Morfin. He denied Morfin lived next door to him, he did not recall if Morfin ever lived in the apartment next door, and he did not recall if he told Sanchez otherwise.

Fierro said he was not home at the time of the shooting and he did not know if Denise was there. He knew who Lazy (Luna) and Lucky (Romo) were in the text, but did not recall receiving the text. When he returned home later that night, the crime scene was blocked off and he learned the next day that Francisco had been shot.

Luna's younger brother, Fernando, was the prosecution's key witness.[8] He testified that he spent the afternoon of Francisco's murder in Fierro's apartment at the Block. Also present were Denise, Fierro, and Fierro's brother. Romo and Vera came by

---

[8]     The prosecutor anticipated testimony by both Romo and Fernando regarding the details of Francisco's murder in exchange for grants of immunity. However, Romo invoked his Fifth Amendment rights and refused to answer any questions beyond basic background information.

at some point, and they told Morfin and Luna that they ran into brothers Francisco and Jose at a store. The brothers pulled a gun, and one of them said not to hang "around with the people on 'The Block' because they were no good." Fernando described Romo and Vera as scared by the run-in, but he also said they tended to exaggerate.

Fernando testified that Morfin did not like Francisco or Jose, and, in Fernando's view, Morfin was trying to turn younger gang members, including Romo and Vera, against the brothers by "brainwashing" them with free drugs. Angered by what Romo and Vera reported, Morfin and Luna decided to try obtaining a phone number to talk with Jose and Francisco.

Fernando said he had no "beef" with Jose or Francisco, but at Morfin's request, he used Denise's phone to access his Facebook account. He sent Francisco's sister a message at 6:19 p.m. asking, "Aye whats your bros number?" Francisco's sister did not see the message until after Francisco's death and never responded to it.

According to Fernando, someone else used Denise's phone and started calling around looking for Francisco's phone number. At some point, either Romo or Vera obtained the number. Someone reached Francisco, and Morfin and Luna confronted him about the run-in with Romo and Vera.[9] The phone call was on speaker and Fernando heard attempts made to meet up with Francisco.

After that phone call, Fernando, Luna, Morfin, Vera, Romo, and Ruben A. went to Morfin's apartment next door, which was empty because Morfin was moving out, and began grabbing guns from a black, guitar-like briefcase.[10] Fernando testified that the

---

[9] Fernando's testimony was inconsistent. He testified he did not remember who called Francisco, but in later testimony, he said Morfin and Luna talked to Francisco and told him he needed to come to the Block to talk about what happened with Romo and Vera. He then testified that Luna did not make a call trying to find Francisco's number and was not nearby when the phone call to Francisco was made.

[10] Ruben was later located by phone during the investigation, but he was in Mexico and did not provide any information.

guns belonged to Morfin. Fernando took a nine-millimeter and Luna had a .40- or .45-caliber, Vera had a .357-caliber, Romo had a rifle, and Ruben had a shotgun.

Fernando denied there was any plan to shoot Francisco, but he and Ruben lifted Romo onto the roof of the apartment complex. Fernando said the area between the air conditioning units for apartment Nos. 4 and 5 was frequently used as a lookout location. Fernando last saw Luna, Morfin, and Vera standing by the trash can, which was another lookout location they used. He said he had been given marijuana to roll and he went back inside Fierro's apartment to do that. Fierro, Fierro's brother, and Denise were also inside.

Fernando heard someone say that someone was coming through the back several times and he then heard multiple gunshots. Morfin came to the apartment door alone and told Fernando in a panicked tone to "'dip,'" which meant leave. Fernando testified he then ran alone to his aunt's house, approximately one mile away. He testified he did not fire his gun, did not see a body, and did not know who shot Francisco, but he heard shots from two different guns.

### b. Events Subsequent to Shooting

On December 24, 2013, between 1:15 a.m. and 4:45 a.m., approximately, a series of text messages was exchanged between cell phones linked to Fernando's girlfriend, Alma M., and Luna's girlfriend, Sandra V.[11] The first text sent from Alma's phone read, "Babe u up[?]" Someone responded, "Layn dwn wit penelope." Although Sandra disclaimed knowledge of the texts, she conceded no one other than Luna called her "Babe" and the two shared a daughter named Penelope.

Someone sent a text from Alma's phone asking to be picked up and received the response, "We went on friday to pik u up but u decided to hide." A text sent from Alma's phone then said, "Im in some shit babe. [¶] Dont ask ill tell u later."

---

[11] Sandra testified she did not recall her phone number or the text messages, and she denied she picked Luna up on December 24, 2013. However, the cell phone was in Sandra's possession when Luna was arrested, and Redding police documented the phone number.

Other texts reflected that the person texting from Alma's phone was being driven by "Nando," which was Fernando's nickname, and the person texting from Sandra's phone was with "tio," which was what Sandra called her sister's husband. By text, an arrangement was reached to meet at a gas station in Dunnigan, which is between Winton and Redding.

On December 25, 2013, around 2:45 p.m., someone who self-identified as "Flaco de Turlock" texted from Alma's phone about an SKS rifle for sale. Around 11:00 p.m., a text sent to Alma's phone asked for a picture of the SKS and the response read, "I dnt gt none bt its hella sick jst dnt tell no one i gt it." At trial, Fernando testified he did not own a cell phone, but he and other people used Alma's phone. He did not know how Luna ended up with Alma's phone on December 24, 2013, and he denied he sent the texts about the SKS or had any knowledge about an SKS for sale. Fernando identified Flaco as Alma's brother, but said Flaco was not gang-involved.

On December 26, 2013, Fierro and his brother were pulled over and arrested after police found a gun and drugs in the car. Fierro later pleaded no contest to being an accessory after the fact, based on aiding Romo after the commission of a murder. Fierro also pleaded to possession of a firearm and a controlled substance. Fierro testified the accessory charge was based on hiding the murder weapons, but he denied he was involved and stated he took the plea deal because he was tired of fighting the case. Fierro denied he helped anyone after the murder and said he did not recall having uniforms inside his car with the name Arturo on them.

In February 2014, Fernando and Alma were arrested. They discussed alibis while in the backseat of the patrol car. Fernando told Alma not to say anything but at trial, he denied he told her to make up a story. After initially telling Detective Sanchez he was not at the Block that night and did not know anything, Fernando reached out to Sanchez through Alma and began cooperating with law enforcement in exchange for a plea deal.

16.

Luna was also arrested in February 2014, outside the Redding apartment he shared with Sandra and their daughter. In the apartment, police located a high-capacity magazine for a Glock, a rifle scope, marijuana, and bags of suspected methamphetamine.

In March 2014, Morfin was arrested in Redding while at work. Police located his car, which was green.

### D.    Gang Evidence

Through multiple witnesses, including Jose, the prosecutor introduced gang evidence relating to WVP, the Sureños and the Mexican Mafia, and linking the groups. Jose explained that WVP was a Sureño-affiliated gang that identified with the color blue, the Dallas Cowboys and the number 13, and the number of members varied between 30 and 100, depending on whom one asked. Department of Corrections Special Agent Rochester testified that the 13th letter of the alphabet is "M," and the number 13 signifies M for Mexican Mafia. The number 13 is also represented by three dots or three dots with two bars, which is the Mayan symbol for the number 13. Among other tattoos, Jose had three dots tattooed under his left eye, as did Erick; Fernando had the number 13 tattooed on his stomach; Luna had the numbers 1 and 3 tattooed on the backs of his calves; Morfin had a WVP tattoo on his back; and Santiago Martinez, a Mexican Mafia associate who is discussed below, had three dots tattooed under his left eye and three dots and two bars tattooed on his neck.

Special Agent Rochester and Deputy Goncalves, who was with sheriff department's gang task force, testified about gang structure and activities. Rochester told the jury the Mexican Mafia, a prison gang, has 2,610 validated associates and 167 validated members called "brothers" who are of equal rank. Each validated member oversees a different territory and that member controls everything that happens within that territory. Underneath the Mexican Mafia is the Sureño subset, which numbers more than 10,000. The Sureños in each "family" area engage in criminal activities such as prostitution, driveby shootings and drug activities, and they pay money, or taxes, to the

17.

Mexican Mafia. Rochester estimated each of the 167 Mexican Mafia members earns between $40,000 and $50,000 per month in taxes, although the money is dispersed to family and others on the street to avoid seizure.

Goncalves described primary activities of the Sureños as including vandalism, burglary, theft, assaults with or without weapons, narcotic sales, firearm sales, and murder. Goncalves testified that drug sales and firearm sales form the backbone of the gang's illegal activities, and the money earned is funneled to different areas of the organization, including to Mexican Mafia representatives as an "insurance policy for safety purposes."

The parties stipulated that Luna and Morfin each committed a predicate offense within the meaning of section 186.22, subdivision (e): in 2007, Luna, then a juvenile, committed an unspecified predicate offense and admitted a gang enhancement, and in 2008, Morfin fired a shot at rival gang members and pled guilty to assault by means of force likely to produce GBI and participation in a criminal street gang. In addition, the prosecutor introduced evidence that Vera had a juvenile adjudication for possession of a firearm, in violation of section 25400, subdivision (a)(2); and Romo and Fernando pled guilty to voluntary manslaughter.

Rochester testified that each prison yard has a mesa, or a table, which is a group of four or five Sureño gang members who represent the Mexican Mafia and make decisions for that yard. Goncalves further explained that a mesa is "basically a governing board of generally five people that are there to carry out … tasks at the direction of … identified Mexican Mafia members [who have] control over those … yards and/or prisons." Rochester opined that when Morfin pressed Jose over setting up a mesa after Jose's release from prison, Morfin was "trying to set up a group to make decisions in their area underneath the Mexican Mafia member."

Relevant to Luna's challenge to the admission of his jail calls, Goncalves testified regarding a wiretap investigation called "Operation Scrapbook" that began in 2016. The

investigation targeted Merced and Stanislaus County Sureño gang members and Mexican Mafia members. During the investigation, Goncalves learned that a cell phone had been smuggled into the Merced County Jail. Luna was one of the people using the phone inside the jail and he communicated with Martinez, who, as a validated Mexican Mafia associate, outranked Luna and was positioned to give orders. In those calls, Luna and Martinez discussed Luna "set[ting] up shop" in the Merced County Jail, which Goncalves testified meant set up to traffic in contraband such as phones and drugs, and they discussed some resistance by another inmate who was already in charge of the Sureños in the jail. Luna and Martinez also discussed killing another inmate and using a woman to smuggle contraband.

## II. Defense Case

### A. Luna

Detective Sanchez was Luna's only witness. Sanchez testified that when Fernando was arrested in February 2014, he was wanted in connection with Francisco's murder. In March, Sanchez listened to the recording of Fernando's and Alma's conversation in the back of the patrol car. They talked about getting their stories straight and saying they were at her mother's house. Alma also said she threw her phone out because she did not want police to see photos and text messages. She said her mother would go look for it, and Sanchez confirmed police never found the phone.

In March, Alma left a voicemail message for Sanchez, telling him that Fernando wanted to speak with him. When Sanchez saw Fernando at the jail, Fernando stated he wanted to be a witness against the other suspects in the case: Luna, Morfin, Romo, and Vera. Fernando stated his understanding was that usually only one person can take the stand against the other suspects and he wanted to be the one.

Sanchez told Fernando that they found text messages on the phone he shared with Alma regarding selling an SKS rifle. Sanchez suspected the text could be referring to the murder weapon because an SKS rifle only takes 7.62 by 39-millimeter caliber bullets and

19.

could have fired the Fiocchi shell casings found at the crime scene. However, Fernando denied it was the rifle that killed Francisco and stated he was referring to a MAC-10 subsequently confiscated when Danger (Fierro) and Acho (Fierro's brother) were arrested on December 26, 2013. Sanchez told Fernando a MAC-10 does not take 7.62 by 39-millimeter caliber bullets and, therefore, was not the murder weapon.

Sanchez testified he had information from Romo that Fernando fired the shot from the roof while Fernando said Romo was on the roof.

When Sanchez first questioned J.V., he knew J.V. was associated with WVP and he had some information J.V. might know something about the murder, but J.V. told Sanchez he did not know anything. One week later, Sanchez questioned J.V. a second time and told him authorities had information from an informant that he knew a lot more than he said he did. Sanchez gave J.V. the Penal Code, pointed out section 182 on conspiracy, and told him he could be sentenced to 25 years to life for conspiracy to commit murder. Sanchez then drove J.V. to the jail, although he was not under arrest. Just prior to reaching the jail, J.V. became cooperative, and he told Sanchez he picked up Vera and Romo at the murder scene.

On cross-examination, Sanchez testified that Fierro and his brother were arrested on December 26, 2013, leaving the Block. With them, they had a MAC-10, a Glock magazine, .40-caliber rounds, and latex gloves with shotgun shells in the fingers similar to the glove located in Morfin's apartment. There was a lot of clothing in the car as well, including uniform shirts with the name Arturo on them.

### B. Morfin

Morfin also called Detective Sanchez to testify. Defense counsel questioned Sanchez about crime in Merced County, tensions between A-Town and WVP, and investigating gang cases. Counsel elicited testimony that only Morfin's apartment was searched after the murder, Morfin's notice of intent to vacate his apartment as of December 31, 2013, was dated early November 2013, and even though Fierro was

20.

arrested three days after the murder and police found items potentially related to the murder in his car, his apartment was not searched.

Regarding J.V., counsel elicited testimony that when Sanchez told him he could face 25 years to life, Sanchez did not have any information that J.V. was involved in committing the murder and instead had information that after the murder, J.V. picked two people up from the scene and gave them a ride.

The last call to Francisco's phone noted by Sanchez was from Manuel S., J.V.'s cousin and an active gang member whose moniker was Trigger. The call lasted 42 seconds, indicating it was answered. Manuel refused to cooperate in the investigation.

Maria R., Morfin's former girlfriend, testified as a character witness. She and Morfin were together almost four years and had plans to marry. She lived with him in the Myrtle Street apartment and they then moved to Redding together, where Morfin was arrested. She testified she knew he had a past and used to be a gang member, but to her, he was a good, hardworking person. Although they were busy and she both worked and went to school, she stated Morfin did not have contact with gang members, she never saw any weapons, and she never saw him wearing blue clothing or making gang signs. When Morfin was arrested in 2014, Maria was shocked and thought police were lying because he was "normal every single day" and she "never once doubted him."

On cross-examination, Maria identified some items from apartment No. 4 as theirs, such as the curtains and his wallet, but she said other items, including a chair, clothing, the gun case, a gun cleaning kit, a box of ammunition and marijuana in the freezer, did not belong to them. She also said she did not know Fierro, Luna, or Fernando; and she had not heard that Morfin fired multiple shots at a perceived Norteño gang member in 2008, or that in jail he was caught with a stabbing instrument and was involved in a gang fight.

Finally, Officer Cardoza testified that when he interviewed Vanessa at the hospital following Oscar's shooting, she told him they were walking down the street to her

21.

boyfriend's house when her son saw a large, loud, dark colored pickup truck. She said Oscar got excited when he saw "'big trucks'" and he alerted her to the truck. Vanessa heard a pop, Oscar started crying, and she saw blood when she picked him up.

Cardoza also testified that a second shooting occurred close in time, and he interviewed the victim and the victim's brother two days later at the hospital.[12] Police thought it possible the shootings might be related based on a similar vehicle description, but they did not consider the shootings to be one incident. However, police were unable to establish a time for either shooting or locate a crime scene for either shooting.

### III. Rebuttal

Detective Sanchez testified in rebuttal regarding phone calls among phone numbers associated with Morfin's, Fierro's, and Fernando's phones. Specifically, he testified that multiple calls were made between Fierro's and Morfin's phones beginning on December 14, 2013. On the day of Francisco's murder, there were three incoming calls to Fierro's phone from Morfin's phone: a call at 7:22 p.m., another call two minutes later that likely went to voicemail, and a third call at 8:20 p.m. that was not answered.

There were also multiple calls between Morfin's phone and the phone shared by Fernando and Alma. On the day of Francisco's murder, there was an incoming call to Fernando's and Alma's phone from Morfin's phone at 1:22 p.m. and outgoing calls from Fernando's and Alma's phone to Morfin's phone at 8:35 p.m., 8:47 p.m., 8:49 p.m., 8:52 p.m., and 9:44 p.m. There was also an outgoing call from Morfin's phone to Denise's phone at 8:36 p.m.

During cross-examination by Morfin's counsel, Sanchez testified that there were 48 phone calls between Morfin's phone and Fierro's phone, and only three of those calls occurred on the day of Francisco's murder. Sanchez also agreed that in the month of

---

**12** Morfin's counsel intended to call the victim of the second shooting and his brother to testify at trial based on their description of the involved vehicle as a dark green truck, but, outside the presence of the jury, both invoked their Fifth Amendment rights.

December, the approximately 19 phone calls between Fernando's and Alma's phone and Morfin's phone occurred in clusters, and the day of Francisco's murder was one of those several clusters.

## DISCUSSION

### I.      Luna's Claims

#### A.      Denial of Motion to Sever Trial

##### 1.      Background

Luna was arrested in February 2014 and Morfin was arrested in March 2014. Initially, Luna and Fernando were charged separately from Morfin. Subsequently, Luna, Morfin, Fernando, Vera and Romo were jointly charged in connection with Francisco's murder. At the time, Morfin was not charged in the murder case with the crimes against Oscar.

Anticipating that the prosecutor would seek to introduce evidence of Oscar's shooting at trial, Luna filed a motion under section 1098 requesting to sever his trial from that of Morfin's. Luna argued that the evidence relating to Oscar's shooting, to which he had no connection other than shared gang membership, was so prejudicial that it would deprive him of a fair trial. Luna contended "[t]he wounding of an innocent child by a gun is an unconscionable act whose admission into evidence in [his] trial would cause serious prejudice. The shooting of gang members by each other is reprehensible, but the shooting of a child is unforgivable," requiring either the exclusion of evidence of Oscar's shooting or severance of Luna's and Morfin's trials.

Thereafter, the prosecutor opposed Luna's motion to sever his trial from Morfin's and moved to consolidate the pending charges brought separately against Morfin for Oscar's shooting with the murder charges against Morfin. (§ 954.) The prosecutor argued that joinder of the charges against Morfin was proper because they involved different offenses of the same class under section 954, and that a joint trial of Luna and Morfin was not unduly prejudicial.

23.

The trial court considered the motions and opposition, granted the prosecutor's motion to consolidate the charges against Morfin, and denied Luna's motion to sever his trial. The prosecutor thereafter filed an amended information.

On appeal, Luna argues that the trial court erred in denying his severance motion because joinder of the charges against Morfin for shooting Oscar pursuant to section 954 resulted in prejudice that rose to the level of a due process violation. The People contend no error occurred. For the reasons set forth below, we conclude the trial court did not abuse its discretion when it denied Luna's severance motion and the record does not support his claim he was deprived of a fair trial.

### 2. Legal Principles

#### a. Joint Trials

Joint trials are governed by section 1098, which provides, "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial."

Severance is the exception rather than the rule (*People v. Cleveland* (2004) 32 Cal.4th 704, 726; accord, *People v. Thompson* (2016) 1 Cal.5th 1043, 1079 (*Thompson*)), but "'"[t]he court should separate the trial of codefendants 'in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that at a separate trial a codefendant would give exonerating testimony'"'" (*Thompson, supra*, at p. 1079; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 274 (*Gomez*)). "Severance may also be appropriate where '"there is a serious risk that a joint trial would compromise a specific

trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.”’” (*Gomez, supra*, at p. 274; accord, *People v. Souza* (2012) 54 Cal.4th 90, 109.)

### b.      Joinder of Separate Offenses

Regarding joinder of the separate offenses committed by Morfin, section 954 provides, “An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or *two or more different offenses of the same class of crimes or offenses*, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated….” (Italics added.) “Because it generally promotes efficiency, joinder of charges is ‘“preferred by the law.”’” (*People v. Romero and Self* (2015) 62 Cal.4th 1, 28.) Further, cross-admissibility of evidence is not required. (§ 954.1; *People v. O’Malley* (2016) 62 Cal.4th 944, 968.) Because the offenses of murder and assault with a firearm are “‘assaultive crimes against the person,’” the statutory requirements for joinder of Morfin’s separate crimes were met (*People v. Earle* (2009) 172 Cal.App.4th 372, 417), and Luna does not argue otherwise.

However, a trial court may nevertheless err by failing to sever claims that meet the statutory requirements for joinder. As articulated by the California Supreme Court, “[w]e first consider whether evidence of each of the offenses would be cross-admissible in ‘hypothetical separate trials.’ [Citation.] If the evidence is not cross-admissible, we then consider ‘whether the benefits of joinder were sufficiently substantial to outweigh the possible “spill-over” effect of the “other-crimes” evidence on the jury in its consideration of the evidence of defendant’s guilt of each set of offenses.’ [Citation.] In making this assessment, ‘we consider three additional factors, any of which—combined with our earlier determination of absence of cross-admissibility—might establish an abuse of the trial court’s discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case

or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case. [Citations.] We then balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state.' [Citation.] [¶] On the other hand, if the evidence is cross-admissible, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.'" (*People v. Armstrong* (2016) 1 Cal.5th 432, 456; accord, *People v. O'Malley, supra*, 62 Cal.4th at p. 968.)

### 3. Standard of Review

"We review a trial court's denial of a severance motion for abuse of discretion, based on the facts at the time of the trial court's ruling. [Citation.] 'Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial.'" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 819; accord, *Thompson, supra*, 1 Cal.5th at p. 1079.) Conversely, ""even if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]'" [Citation.] Defendants bear the burden of establishing that the trial was grossly unfair and denied them due process of law, and 'a judgment will be reversed on this ground only if it is "reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.""" (*People v. Daveggio and Michaud, supra*, at p. 821; accord, *Thompson, supra*, at p. 1079.)

### 4. Analysis

In *Calderon*, cited by Luna in support of his claim, the defendant and his codefendant were jointly charged with premeditated attempted murder. The trial court

26.

thereafter granted the prosecutor's motion to consolidate the case with a separate case pending against the codefendant for a murder and an attempted murder that occurred during a separate incident approximately three weeks earlier. (*Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 935–936 (*Calderon*).) The Court of Appeal concluded that in cases involving a joint trial of codefendants where crimes from separate episodes are also charged, "the issues are closer to those encountered under section 954 (joinder of counts)" (*id.* at p. 939), and, therefore, the appellate court relied on the factors relevant to joinder of counts under section 954 to assess the trial court's denial of the severance motion. The parties in this case do the same.

Relying on *Williams v. Superior Court* (1984) 36 Cal.3d 441 (*Williams*), superseded by statute on another ground as stated in *Alcala v. Superior Court* (2008) 43 Cal.4th 1229, 1205, footnote 19, and *Calderon*, Luna argues that in light of the limited cross-admissibility of the evidence, the inflammatory nature of shooting a child, and the relatively weaker evidence in the murder case, the trial court erred in denying his motion to sever his trial from Morfin's. Further, the error was not harmless beyond a reasonable doubt and he was deprived of his right to a fair trial. We review each in turn and find them unpersuasive.[13]

### a.    Cross-admissibility of Evidence

In *Williams,* which was before the court on a writ of mandate, the California Supreme Court concluded that the trial court erred when it denied the defendant's motion to sever the separate charges against him, which stemmed from different events; and the court granted the writ and directed the trial court to grant the motion for separate trials. (*Williams, supra*, 36 Cal.3d at p. 454.) The defendant, a gang member, was charged with murder and attempted murder stemming from a shooting that occurred in an area frequented by both his gang and a rival gang. He was placed at the scene, but there was

---

[13]    Because this is not a capital case, we do not analyze the fourth factor.

27.

no direct evidence he was the shooter, and the victims were not gang members, although they were friends with members of the rival gang. In the second case, the defendant was charged in connection with the murder of a boy, who was not a known gang member, standing on the street. One witness identified the defendant as the driver and said the boy was shot from the driver's side, but neither she nor the other witness was certain the driver was the shooter.

On review, the high court concluded that there was no cross-admissibility of evidence between the separate shootings. (*Williams, supra*, 36 Cal.3d at p. 450.) Identity was the only theory under which the evidence was arguably cross-admissible (*id.* at p 449), and the court explained, "[I]t is readily apparent that evidence of each shooting incident would not be admissible to prove identity in the respective trial of the other under Evidence Code section 1101, subdivision (b), since the two incidents do not bear the requisite similarity to each other. The two shootings certainly do not possess "'a sufficiently high degree of common features … where they warrant the inference that if the defendant committed the other acts he committed the act charged."' [Citations.] Indeed, there is very little similarity between the two incidents except for the inference that they both may have been gang-related. The circumstances of the incidents differ in virtually every regard—the location, the time of day, the number of people involved, and the method of attack. In addition, there is no evidence that the same weapon was used in the fatal assaults, and it certainly could not be fairly claimed that the two episodes reveal a common design or plan." (*Id.* at p. 450.) This left only shared gang membership and while the court declined to consider the standards governing admissibility of gang evidence generally or the admissibility of gang evidence in that case specifically, it stated that factor "might very well mitigate *against* admissibility of one offense in the trial of the other, since it is arguably of limited probative value while creating a significant danger of unnecessary prejudice." (*Ibid.* & fn. 8.)

28.

In *Calderon*, also before the reviewing court on a pretrial writ, the Court of Appeal found the trial court erred when it granted the prosecutor's motion to consolidate the two cases pending against the defendant's codefendant. (*Calderon, supra*, 87 Cal.App.4th at pp. 935–936.) The court stated that evidence from the earlier shooting allegedly committed by the defendant's codefendant was admissible against the defendant *only* to the extent that both the defendant and his codefendant were active members of the same gang and both criminal cases included gang enhancement allegations. (*Id.* at pp. 939–940.) However, evidence from the earlier shooting was not necessary to prove the gang allegation attached to the later shooting, and the court concluded that evidence from the earlier shooting was unduly prejudicial. (*Id.* at p. 941.)

Relying on *Williams* and *Calderon*, Luna maintains that the evidence in Oscar's shooting was cross-admissible in the murder of Francisco only as to gang issues and that commonality alone did not support joinder because the prosecutor did not need the gang evidence from Oscar's case to prove the identity of Francisco's shooter.

As an initial matter, we observe that *Williams* was decided almost 40 years ago and prior to the 1988 enactment of section 186.20 et seq. (the California Street Terrorism Enforcement and Prevention Act). In a subsequent case, the California Supreme Court explained, "In cases *not* involving the gang enhancement, we have held that evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. (E.g., *People v. Cardenas* (1982) 31 Cal.3d 897, 904–905.) But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime."

29.

(*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)[14]  Therefore, we do not find the decision in *Williams* helpful to Luna.

"Cross-admissibility is not … a precondition to joinder of charges," and, therefore, "'"[it] is not the sine qua non of joint trials"'" (*People v. O'Malley, supra*, 62 Cal.4th at p. 968).  "While the presence of such evidence '"is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges"' [citation], the absence of cross-admissible evidence does not bar joinder." (*Ibid.*; accord, *People v. Armstrong, supra*, 1 Cal.5th at p. 456.)

Here, gang enhancement allegations were attached to the charged crimes and, therefore, some of the gang evidence was cross-admissible to prove the elements of the gang statute.  Moreover, notwithstanding Luna's contrary position, evidence from Oscar's shooting was clearly relevant to motive.  As such, the evidence was cross-admissible under Evidence Code section 1101, subdivision (b).  The prosecution theorized that Francisco's murder was motivated by a rift between younger members of WVP, led by Morfin and Luna, and older members of WVP, including Francisco and Jose.  At the preliminary hearing, Jose testified that there was bad blood between Morfin and himself prior to Oscar's shooting; and Morfin glorified prison life and putting in work for the gang while Jose neither viewed imprisonment as a source of pride nor sent others out looking for trouble.  After Oscar was shot, Vanessa told Jose that Art or Arthur, whom he knew to be Morfin, shot their son.

Although this evidence was ultimately not introduced at trial due to Romo's refusal to testify, at the preliminary hearing, Detective Sanchez related that Romo said on the night of Francisco's murder, Morfin told the group "he was already … 'fucked'"

---

**14**    The Legislature recently amended section 186.22 and added section 1109, which concerns the bifurcation of substantive gang offenses and gang enhancements.  (Assem. Bill No. 333 (2021-2022 Reg. Sess.) ch. 699, § 4, p. 8, § 5, pp. 11–12.)  Those changes are effective January 1, 2022.

because he had shot Jose's son. (*People v. Daveggio and Michaud, supra*, 4 Cal.5th at p. 819 [ruling evaluated based on facts at the time].) Luna then called around trying to get Francisco's number and once Luna reached Francisco, he requested to see Francisco regarding an issue with Romo and Vera. Francisco agreed and he was gunned down when he arrived at the apartment complex.

While Luna was not involved in Oscar's shooting, as he points out, the shooting was probative of the motive underlying Francisco's shooting only four days later. Given the existing rift, a reasonable trier of fact could conclude that Morfin's act of shooting and wounding Oscar was the tipping point: Morfin knew there would be consequences for shooting Oscar and his group had nothing to lose by making a bold move to assert control over the gang.

Unlike *Williams* and *Calderon*, the separate crimes in this case did not involve mere shared gang membership, and the prosecutor did not plan to use the earlier shooting only to prove the gang enhancement charged in Francisco's shooting. (*Williams, supra*, 36 Cal.3d at p. 450; *Calderon, supra*, 87 Cal.App.4th at pp. 940–941.) Rather, as we discuss in more detail when we address Luna's challenge to his murder conviction, the prosecutor relied on the theory that the shootings were connected and that the earlier shooting by Morfin was highly probative of the motive for the group's murder of Francisco only four days later.

### b.     Inflammatory Nature of Charges

Next, Luna argues that the highly inflammatory shooting of a small child was so prejudicial that it deprived him of a fair trial. We agree that society views both gang crimes and crimes committed against children with repugnance. However, "the animating concern underlying this factor is not merely whether evidence from one offense is repulsive, because repulsion alone does not necessarily engender undue prejudice. [Citation.] Rather, the issue is 'whether "'strong evidence of a lesser but

31.

inflammatory crime might be used to bolster a weak prosecution case' on another crime.""" (*People v. Simon* (2016) 1 Cal.5th 98, 124.)

In this case, it was clear Luna was not involved in the shooting of Oscar; Oscar, very fortunately, was neither killed nor gravely wounded; and Oscar was not the intended target. Further, although terrible, the crime was not more inflammatory than the premeditated murder of Francisco by ambush. Under these circumstances, the joinder of the charges against Morfin arising from Oscar's shooting were not "unusually likely to inflame the jury against [Luna.]" (*People v. Landry* (2016) 2 Cal.5th 52, 78.)

### c. Strength of Cases

Finally, we disagree that the case against Luna for murdering Francisco was notably weak compared to the case against Morfin for shooting Oscar. "The core prejudice concern arising in connection with this issue is that jurors may aggregate evidence and convict on weak charges that might not merit conviction in separate trials." (*People v. Simon, supra*, 1 Cal.5th at p. 127.) Although lengthy, the trial in this case did not involve complex facts that might have resulted in the jury confusing the evidence and issues between the separate crimes of Oscar's shooting and Francisco's murder.

Luna contends that the case against Morfin for shooting Oscar was stronger because Vanessa identified Morfin to police as Oscar's shooter while the "evidence showed [only] that he 'may have made' a call to Francisco's phone on the evening in question," and although he was linked to the shooting by Romo and Fernando, "their credibility was suspect because … each had a motive to shift blame to others." This was not a case built on a tenuous identification of involved participants by strangers, however. Rather, the involved parties knew one another well. Sanchez testified at the preliminary hearing that Jose told him Luna called Francisco that night and the two were going to meet; and, as discussed, Romo told Sanchez that Luna called Francisco, lured Francisco to the apartment complex, and, along with others, armed himself with a gun, a .357-caliber revolver specifically.

Based on the foregoing, we reject Luna's claim that the trial court abused its discretion when it denied his severance motion. We also reject his claim that, irrespective of a proper exercise of discretion, the ruling resulted in "a gross unfairness" that violated his right to due process and a fair trial. (*Thompson, supra*, 1 Cal.5th at p. 1079.)

## B.     Admission of Francisco's Statements to Jose

### 1.     Francisco's Plan to Meet Luna

#### a.     Background

At the preliminary hearing, Jose testified that Francisco received a phone call on the night of his death and then called Jose. Francisco seemed "bothered" and said, "'They called me and said if I got a problem with Dark[]y.'"[15] Jose identified the caller as Luna. Although the trial court sustained Luna's counsel's objection, the testimony was later elicited during cross-examination by Vera's counsel. Jose testified that Francisco did not say whom he was going to meet, but he later stated he could not recall if he told Detective Sanchez that Francisco said he was going to meet Luna. However, Jose said he was truthful in his interview and his memory was clearer the night of the murder. Subsequently, Sanchez testified that Jose told him Francisco was going to meet the caller, Luna.

During motions in limine, Luna's counsel acknowledged that Francisco's statement to Jose could be admitted as a statement of intent by Francisco and a prior inconsistent statement by Jose, but she argued that the statement was untrustworthy because Jose testified his brother did not say whom he was going to meet. Morfin's counsel joined in the objection.

The court held a hearing at which Jose testified that Francisco said he received a call from Luna, but did not say he was going to meet Luna. (Evid. Code, § 402.) After

---

[15]     Darky is Vera's nickname.

33.

the hearing, Luna's counsel conceded past recollection recorded and prior inconsistent statement were valid grounds for admission of Jose's statement to Detective Sanchez, but she argued the statement was untrustworthy because Jose was distraught over Francisco's death.

The trial court then ruled that Francisco's statement he received a call from Luna and was going to meet Luna was admissible to explain the conduct of Francisco, and Jose's statement to Detective Sanchez was admissible as a past recollection recorded or a prior inconsistent statement. Later, the trial court narrowed the ruling, concluding Francisco's statement to Jose that Luna called him was inadmissible hearsay, but his statement to Jose that he was going to meet Luna was admissible through Detective Sanchez as a statement of Francisco's intent and a prior inconsistent statement by Jose.

On appeal, Luna concedes, as he did in the trial court, that Francisco's statement was admissible under Evidence Code section 1250. However, joined by Morfin, he challenges the admission of Jose's statement to Detective Sanchez on the grounds that it did not meet the requirements for admission as either a past recollection recorded or a prior inconsistent statement.[16] He also claims Jose's statement should have been excluded as untrustworthy because it "has all the earmarks of Detective Sanchez's aggressive fabrication." The People contend Luna only preserved the claim that the

---

**16**      In briefing, Luna describes Francisco's statement to Jose as triple hearsay, with Detective Sanchez's police report comprising the first level. Luna does not challenge admissibility of the police report, but we observe that neither the parties nor the trial court anticipated admitting the report. Rather, because Jose testified at the preliminary hearing and the Evidence Code section 402 hearing that Francisco did not say he was going to meet Luna, but Sanchez wrote in his report that Jose stated Francisco said he was going to meet Luna, it was anticipated Jose's statement would come in through Sanchez as a prior inconsistent statement. Therefore, the issue concerns two rather than three levels of hearsay. (*People v. Anderson* (2018) 5 Cal.5th 372, 403 [what a witness told an investigator the defendant said is double hearsay, admissible through the investigator as a prior inconsistent statement of the witness and as an admission by the defendant].)

34.

statement was untrustworthy for review. Further, they contend his claim fails on the merits and any error in admission was harmless.

In response, Luna argues his claim is not forfeited because his objection to the evidence as untrustworthy undermines admission under any exception to the hearsay rule.

We reject Luna's and Morfin's claim of error on the merits, as discussed next. Therefore, we do not reach the issue of forfeiture. (*People v. McDaniel* (2021) 12 Cal.5th 97, 129.)

### b.   Legal Principles

"Hearsay is an out-of-court statement that is offered for the truth of the matter asserted, and is generally inadmissible." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1108, citing Evid. Code, § 1200; accord, *People v. Sanchez* (2016) 63 Cal.4th 665, 674.) "[M]ultiple hearsay is admissible for its truth only if each hearsay layer separately meets the requirements of a hearsay exception." (*People v. Arias* (1996) 13 Cal.4th 92, 149, citing Evid. Code, §§ 1200, 1201; accord, *People v. Anderson, supra*, 5 Cal.5th at p. 403.)

The applicable standard of review is well established. "[A] trial court has broad discretion to determine whether a party has established the foundational requirements for a hearsay exception (*People v. Martinez* (2000) 22 Cal.4th 106, 120) and '[a] ruling on the admissibility of evidence implies whatever finding of fact is prerequisite thereto ….' (Evid. Code § 402, subd. (c).) We review the trial court's conclusions regarding foundational facts for substantial evidence. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.) We review the trial court's ultimate ruling for an abuse of discretion (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007–1008; *People v. Martinez, supra*, at p. 120), reversing only if "'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Brown* (2003) 31 Cal.4th 518, 534.)" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132;

accord, *People v. Caro* (2019) 7 Cal.5th 463, 503; *People v. Jackson* (2016) 1 Cal.5th 269, 320–321.)

### c. Analysis

### 1) Past Recollection Recorded

"Evidence Code section 1237 permits evidence of a witness's past statement 'if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:  [¶] (1) [w]as made at a time when the fact recorded in the writing actually occurred or was fresh in the witness'[s] memory; [¶] (2) [w]as made … (ii) by some other person for the purpose of recording the witness'[s] statement at the time it was made; [¶] (3) [i]s offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) [i]s offered after the writing is authenticated as an accurate record of the statement.' (Evid. Code, § 1237, subd. (a).)" (*People v. Cowan* (2010) 50 Cal.4th 401, 465 (*Cowan*); accord, *People v. Sanchez* (2019) 7 Cal.5th 14, 41 (*Sanchez*).)

Relying on *People v. Simmons* (1981) 123 Cal.App.3d 677 (*Simmons*), Luna argues that Jose's statement was not admissible as a past recollection recorded because he was unable to testify that he made the statement or that it was true.  In *Simmons*, however, the witness had no memory of making a statement to police due to amnesia and could not and did not attest he told the truth at the time.  (*Id.* at pp. 679, 682.) Subsequently, in *Sanchez*, the California Supreme Court distinguished the circumstances in *Simmons* from those in which a witness does not recall making a specific statement, but recalls making a statement and attests to its truthfulness.  (*Sanchez, supra*, 7 Cal.5th at p. 41 [child's testimony "that he remembered talking with the police and, critically, he remembered that he told them the truth" sufficient under Evid. Code, § 1237]; *Cowan, supra*, 50 Cal.4th at pp. 466–467 [no error under Evid. Code, § 1237 in admitting testimony by witness whose memory "was 'jumbled' and 'scrambled'" by drug use and

36.

who was delusional at times, where witness testified he was truthful with detective to best of his ability].)

In this case, Jose did not recall Francisco's statement that he was going to meet Luna and did not recall telling Sanchez that Francisco made the statement. However, Jose did recall giving a statement to Sanchez, and he testified that his memory was clearer then and that he told Sanchez the truth at the time. These circumstances are analogous to those in *Sanchez* and distinguishable from those in *Simmons*; therefore, *Sanchez* controls and admission on this ground was proper. (*Sanchez, supra*, 7 Cal.5th at p. 41.)

### 2) Prior Inconsistent Statement

"Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770" (Evid. Code, § 1235), which in turn requires "[t]he witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] [t]he witness has not been excused from giving further testimony in the action" (*id.*, § 770, subds. (a)–(b)). "A statement is inconsistent for this purpose if it has '"a tendency to contradict or disprove the [witness's trial] testimony or any inference to be deduced from it."'" (*Cowan, supra*, 50 Cal.4th at p. 502, quoting *People v. Spencer* (1969) 71 Cal.2d 933, 942.) "Further, '"'[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness'[s] prior statement ....'"'" (*Cowan, supra*, at p. 502, quoting *People v. Hovarter, supra*, 44 Cal.4th at p. 1008; accord, *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1075–1076 [where child molestation victim did not remember her prior statement, trial court properly admitted detective's testimony that she told him about certain acts committed against her because the statements were "sufficiently inconsistent in effect to qualify as a prior inconsistent statement"].)

37.

Luna asserts that Jose's statement was not admissible under this section because Jose did not remember making the statement and the statement was not audio recorded. However, at the Evidence Code section 402 hearing, Jose testified that Francisco did not tell him that he was planning to meet Luna and it was anticipated that he would so testify during the prosecution's case-in-chief. Jose's prior statement to Sanchez was inconsistent with this testimony, and there is no requirement the prior statement be recorded. We reject Luna's contrary position.

### 3) Trustworthiness

Finally, Luna claims that Jose's statement to Detective Sanchez is suspect because it was not recorded, Sanchez lied to Vanessa, and other prosecution witnesses—J.V., A.V., Erick, and Denise—felt threatened, intimidated, or pressured by Sanchez. Notably, Luna cites no legal authority supporting this argument.

We recognize that Evidence Code section 1252, which applies to statements of mental or physical health under Evidence Code sections 1250, 1251, and 1253, provides "[e]vidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness." However, Luna concedes that Francisco's statement was properly admitted under Evidence Code section 1250, and as to Sanchez's credibility, the trustworthiness requirement under Evidence Code section 1252 applies "'to the statement made by the hearsay declarant … not to the testimony of the witness who relates the hearsay statement to the trier of fact.'" (*People v. Riccardi* (2012) 54 Cal.4th 758, 821, disapproved on another ground by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

The California Supreme Court has observed that "'[n]either the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury.'" (*People v. Rangel, supra*, 62 Cal.4th at p. 1219.) Further, "[t]rustworthiness is not an element of the hearsay exception for prior inconsistent statements (Evid. Code, § 1235) but, like most kinds of evidence, a matter for the jury to judge." (*People v.*

*Anderson, supra*, 5 Cal.5th at p. 404.) The jury had before it evidence of Sanchez's various investigatory methods and was aware Jose's relevant statement was not audio recorded; and assessment of Sanchez's and Jose's credibility with respect to this and other issues rested with the jury. (*People v. Hovarter, supra*, 44 Cal.4th at pp. 995–996; accord, *People v. Brown* (2014) 59 Cal.4th 86, 105.)

Having found no error in the admission of Jose's statement that Francisco said he was going to meet Luna, Luna fails to persuade us he was otherwise entitled to exclusion of the evidence because Sanchez was untrustworthy. In the absence of error under state law, Luna's due process claim fails (*People v. Merriman* (2014) 60 Cal.4th 1, 67), and given proper admission under state law, we do not reach his prejudice argument.

### 2. Sixth Amendment Violation

#### a. Legal Principles

Next, Luna claims Francisco's statement to Jose that he was going to meet Luna was testimonial hearsay and was admitted in violation of the Sixth Amendment.[17] This claim, too, lacks merit.

The confrontation clause of "the Sixth Amendment prohibits the admission of a witness's 'testimonial' out-of-court statements offered for their truth unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." (*Gomez, supra*, 6 Cal.5th at p. 297, citing *Crawford v. Washington* (2004) 541 U.S. 36, 59–60 (*Crawford*).) "'Throughout its evolution of the *Crawford* doctrine, the high court has offered various formulations of what makes a statement testimonial but has yet to provide a definition of that term of art upon which a majority of justices agree.'" (*Gomez, supra*, at p. 297, quoting *People v. Sanchez, supra*, 63 Cal.4th at p. 687.) "Nevertheless, 'we

---

[17]    Luna also argues that Francisco's statement Luna called him was inadmissible under the Sixth Amendment. The trial court excluded that statement, however. The subsequent violation of the court's in limine ruling, relevant to Luna's mistrial motion, is addressed in part I.B.3. of the Discussion.

have discerned two requirements. First, "the out-of-court statement must have been made with some degree of formality or solemnity." [Citation.] Second, the primary purpose of the statement must "pertain[] … in some fashion to a criminal prosecution." [Citations.]'" (*Gomez, supra*, at p. 297, quoting *People v. Leon* (2015) 61 Cal.4th 569, 603.) "More specifically, the primary purpose test asks whether the statements at issue 'are given in the course of an interrogation or other conversation whose "'primary purpose … is to establish or prove past events potentially relevant to later criminal prosecution.'"'" (*Gomez, supra*, at p. 297, quoting *People v. Rangel, supra*, 62 Cal.4th at p. 1214.) "In its most recent application of the primary purpose test, the high court cautioned that '[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers.'" (*Gomez, supra*, at pp. 297–298, quoting *Ohio v. Clark* (2015) 576 U.S. 237, 249 [135 S.Ct. 2173, 2182].)

### b. Analysis

As Francisco was deceased and Luna did not have a prior opportunity to cross-examine him, the issue is whether Francisco's statement to Jose that he was going to meet Luna was testimonial. We easily conclude it was not.

Based on a comment made by the prosecutor during motions in limine regarding statements in the police report, Luna argues that Francisco's statement was in the police report and that the primary purpose of the phone call to Jose "was to create evidence to use in a prosecution for murder." However, Luna has not cited to any case that found a statement testimonial under these or similar circumstances.

Jose, not Francisco, gave a statement to police, after the murder. The phone call between Francisco and Jose was a casual conversation between brothers, and it preceded the crime in this case. (*People v. Sanchez, supra*, 63 Cal.4th at p. 689 ["Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony."].) There is simply no evidence in the

40.

record to support an argument that Francisco thought he was about to be murdered or otherwise victimized and he called his brother for the primary purpose of creating evidence for later use in a trial for crimes committed against him. Francisco was bothered by the phone call he received, but there was no history of bad blood between Francisco and Luna and no indication that Francisco feared for his life or feared injury that night. This is borne out by Francisco's decision to go alone to meet Luna at the Block that night rather than either wait for Jose to join him or avoid the situation altogether. Francisco's lack of concern is underscored by the fact his gun remained tucked in his waistband and was not at the ready in hand.

Under these circumstances, the most plausible explanation is that Francisco called Jose simply to warn him that some sort of trouble might be brewing having to do with Vera, but Francisco did not understand what it was about. Because the phone conversation between Francisco and Jose was not testimonial in nature, its admission did not violate the confrontation clause, and in the absence of error, we do not proceed to Luna's claim of prejudice.

### 3. Mistrial Motion

#### a. Procedural Background

As previously set forth, the trial court excluded as hearsay the evidence that Francisco told Jose the caller was Luna. Subsequently, Judge McCabe substituted in for the trial judge, Judge Bacciarini, for one day. (§ 1053.) On that day, the issue was discussed outside the presence of the jury but with Jose present, and he was admonished not to testify that Francisco received a call from Luna. Outside of Jose's presence, the parties agreed that Jose would be asked if Francisco said he was going to meet anyone, and, based on Jose's previous testimony, it was anticipated that Jose would respond, "'No.'"

41.

During Jose's subsequent direct examination, the prosecutor broached the subject of the call Francisco made to Jose at approximately 6:52 p.m. on the night of his murder. The relevant testimony is as follows:

"[PROSECUTOR:] Did [Francisco] tell you he had just received a call from someone, and he was going to go meet that person who called him?

"[JOSE:] Correct.

"[PROSECUTOR:] Who did he say he was going to meet?

"[JOSE:] He said he was going to meet Lazy—well, he didn't—on the phone call when he called he just—you know, he told me, 'Hey, I got a phone call.' [¶] And he said, you know, 'I don't know what they're tripping on.' He says, 'They're talking about Darky' He said—

"[LUNA'S COUNSEL]: I object as hearsay as to the subject of the phone call.

"THE COURT: Sustained.

"[PROSECUTOR:] Yeah. Did he sound bothered or upset?

"[JOSE:] Yes, he did.

"[PROSECUTOR:] And did he say—you told me—it was your testimony that he was not going to meet the caller?

"[JOSE:] Correct. He told me he was going to wait at Turf Liquor.

"[PROSECUTOR:] Okay. Do you recall talking to Detective Sanchez the day after the shooting on December the 24th?

"[JOSE:] I don't remember too much of the days, but I do remember talking to him. I don't know if I talked to him that night and then the next day, I think.

"[PROSECUTOR:] You recall talking to him on the scene that night?

"[JOSE:] Yeah. Yes, I do. I didn't know it was—I didn't know who he was at the time.

"[PROSECUTOR:] This man seated right here (indicating).

"[JOSE:] Yes. That night was the first night I recognized—or I was really familiar with his face.

"[PROSECUTOR:] Do you remember talking to him shortly after that as well?

"[JOSE:] Yes.

"[PROSECUTOR:] Was the conversation with your brother fresher in your mind at that time than it is now?

"[JOSE:] Yeah. It's been a while.

"[PROSECUTOR:] Do you feel like you remembered it better then within a day or so of the incident?

"[JOSE:] Yeah, you could say.

"[PROSECUTOR:] Did you tell the truth to Detective Sanchez as best you could?

"[JOSE:] Yeah, 100 percent. You know, yeah, I didn't lie to him or nothing. Everything I—everything I said was true. I didn't—at that time, I mean, it was just—everything in my world just came crashing in. I didn't—you know, I didn't even have time to try—if I was going to lie, it wasn't even enough time to think of one.

"[PROSECUTOR:] Did you tell him at 6:52 p.m. your brother told you that—

"[MORFIN'S COUNSEL]: Objection. There's not been any— what's the relevance of this of what he told him?

"THE COURT: Let's hear the full question. [¶] Please don't answer it, and then once I hear the full question, reserve your right to object again.

"[PROSECUTOR:] Now, you testified [Francisco] called you at approximately 6:52 p.m.; is that correct?

"[JOSE:] Yes.

["PROSECUTOR:] In that call did he tell you that he got a call from Lazy and agreed to go meet Lazy during that—

43.

"[LUNA'S COUNSEL]: Objection. Hearsay.

"THE COURT: Sustained.

"[MORFIN'S COUNSEL]: Your Honor—

"THE COURT: Sustained.

"[MORFIN'S COUNSEL]: — move to strike, and we need to go—

"THE COURT: Granted.

"[MORFIN'S COUNSEL]: Well, I think we should have a conversation about this out of the presence of the jury.

"[PROSECUTOR]: Under Evidence Code 1250 there's a statement where if he said somebody says, 'I'm going to go meet somebody,' that's an admissible hearsay exception.

"THE COURT: Re-ask it.

"[PROSECUTOR:] Did you tell Detective Sanchez that [Francisco] told you on the phone that he got a call from Lazy and agreed to go meet Lazy?

"[LUNA'S COUNSEL]: I renew my objection that that calls for hearsay.

"THE COURT: Counsel, let's have a chambers conference on this."

In chambers, Luna's counsel, joined by Morfin's counsel, moved for a mistrial based on the prejudice resulting from Jose's elicited testimony that Francisco received a call from Luna. Luna's counsel pointed out that the issue had been argued repeatedly over the years and there was an agreement that Jose's statement to Sanchez that Francisco said he was going to meet Luna would be admissible as a prior inconsistent statement, but the evidence that Francisco identified Luna as the caller was inadmissible hearsay. Luna's counsel acknowledged Fernando might inculpate Luna when he testified, but argued there was little evidence so far linking Luna to the crime and neither an admonition nor a curative instruction would suffice to cure the "irreparable prejudice" arising from the "very thin veneer of …whisper[ed]" testimony inculpating Luna.

44.

The prosecutor responded that in addition to the evidence that Francisco was going to meet Luna, admissible as a prior inconsistent statement by Jose, he anticipated Romo was going to testify that Luna made the phone call to Francisco. The prosecutor explained that he tried to be vague in his questioning of Jose, but Jose became confused, and, as a result, his testimony was inconsistent with that he gave both at the preliminary hearing and at the Evidence Code section 402 hearing. He concluded that because the jury heard evidence that was going to come in at trial, there were no grounds for a mistrial.

Luna's and Morfin's counsel responded that the prosecutor violated the court's specific in limine rulings, which had been extensively litigated, and testimony from Jose that Francisco said Luna called would have greater weight than it would coming from other witnesses. Further, while Romo might testify that Luna made the call, there was another prosecution witness who said someone else made the call.

With the assent of the parties, Judge McCabe continued the matter to the next day so that Judge Bacciarini could rule on the mistrial motion given his greater familiarity with the proceedings in the case. The next day, Judge Bacciarini, having reviewed the transcript, denied the mistrial motion. He found that the court's in limine ruling was clearly violated, but was unpersuaded that the evidence would be accorded great weight simply because it came in through Jose. Since the evidence that Francisco received a call and was going to meet Lazy was going to be admitted through Sanchez, he concluded it was sufficient to strike the testimony and admonish the jury. He warned the parties, however, that if something like that happened again, he would declare a mistrial.

On appeal, Luna, joined by Morfin, claims this was error and the trial court should have granted a mistrial.

### b. Legal Standard

"A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' (*People v. Ayala* (2000) 23

45.

Cal.4th 225, 282), that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' (*People v. Haskett* (1982) 30 Cal.3d 841, 854). 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' (*Ibid.*) Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion. (See *People v. Valdez* (2004) 32 Cal.4th 73, 128.)" (*People v. Avila* (2006) 38 Cal.4th 491, 573; accord, *People v. Harris* (2013) 57 Cal.4th 804, 848.)

### c.    Analysis

As the parties and the trial court below discussed, in the early morning hours following Francisco's murder, Jose told Sanchez that Francisco called and said he was going to meet Luna. However, Jose testified at the preliminary hearing and at the Evidence Code section 402 hearing that Francisco did not say he was going to meet Luna. Therefore, to set up the admission of Jose's statement to Sanchez as a prior inconsistent statement, the prosecutor was tasked with eliciting testimony from Jose that Francisco was not planning to meet Luna or did not say he was planning to meet Luna while taking care to avoid eliciting evidence that the caller was Luna.

Ultimately, as the court found, the prosecutor's questioning of Jose violated the in limine ruling because his question identified the caller as the person Francisco was going to meet and this confused Jose, who contradicted his prior testimony by stating that Francisco said he was going to meet Luna. Jose then immediately backtracked. The prosecutor, however, repeated his error in two follow-up questions that identified Luna as the caller.

After denying the mistrial motion, the trial court admonished Jose again; warned the parties to avoid the verboten testimony; and, after the jury returned, struck the questions and answers objected to by the defense concerning phone calls Jose received

46.

from Francisco.[18] When later instructing the jury, the court reiterated, "If I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose."

The trial court had broad discretion in ruling on the mistrial motion and we do not agree it abused that discretion in denying the motion in this instance. The exchange between the prosecutor and Jose was brief, and, at that juncture, it was anticipated that the jury would hear evidence that Francisco told Jose he received a call and was going to meet Luna. It was also anticipated that other prosecution witnesses might identify Luna as the caller, and, as the trial court recognized, the jury was likely going to surmise Luna was the caller anyway.

The testimony was stricken, the jury was admonished to disregard it, and the jury was later instructed again to disregard testimony that was stricken. We presume the jurors followed the admonishment and instruction. (*People v. Molano* (2019) 7 Cal.5th 620, 676; *People v. Avila, supra*, 38 Cal.4th at p. 573.) Furthermore, as anticipated, the jury later heard, through Detective Sanchez, that Francisco told Jose he was going to meet Luna, and Fernando testified that Luna spoke to Francisco on the phone. These circumstances do not support a conclusion that Luna's chance of receiving a fair trial was irreparably damaged by the isolated exchange between the prosecutor and Jose, and we reject the claim of error.

### C.     Admission of Methamphetamine and Jail-call Evidence

#### 1.     Procedural Background

---

**18**     The jury was admonished, "Before we continue with the direct examination of [Jose], ladies and gentlemen, there was a series of questions asked by the prosecution of [Jose] yesterday about some phone calls he may have received from [Francisco], and there were responses to that which were objected to by the defense. I'm going to order the questions and answers to those questions stricken from the record. You're not to consider them, the answers you heard yesterday, for any purpose whatsoever. [¶] And we talked about that at the beginning of the trial. When I strike an answer, it's to be disregarded and not considered in any way."

47.

Prior to trial, Luna's counsel moved to suppress the evidence of Luna's jail calls with Martinez, obtained during the Operation Scrapbook wiretap investigation into gang activity. (§ 1538.5.) In the event the suppression motion was denied and relevant to Luna's appellate claim, counsel also moved to exclude evidence of the jail calls as irrelevant and unduly prejudicial. Additionally, counsel moved, on those same grounds, to exclude evidence that when police searched Luna's Redding apartment, officers found packages of suspected methamphetamine in close proximity to his infant daughter, which led to her placement with Child Protective Services.

The prosecutor argued that evidence of the drugs was relevant to show the existence of a criminal street gang, drug sales were a primary activity of the gang, and Luna was a gang participant. As well, the prosecutor argued the jail calls were relevant to show gang structure and primary activities of the gang. Luna's counsel maintained the prosecutor had "a fair amount of evidence" of Luna's gang association, including association with gang members and tattoos, and the drug and wiretap evidence was cumulative and more prejudicial than probative. In addition, she argued the wiretap evidence was unduly time consuming.

The trial court denied the suppression motion and the motions to exclude the drug and wiretap evidence. However, after confirming child endangerment was not an enumerated offense under section 186.22, the court excluded mention of Luna's infant daughter and limited the wiretapped phone calls to 30 minutes.

On appeal, Luna claims the trial court abused its direction when it admitted evidence of the methamphetamine found in his apartment and evidence of the wiretapped phone calls. Luna argues the evidence was irrelevant to the issue of his role in Francisco's death and, given the introduction of other gang evidence, including evidence on gang structure through Agent Rochester and Deputy Goncalves, it was unnecessary. Luna characterizes the evidence as inadmissible propensity evidence under state law and

claims it deprived him of a fundamentally fair trial in violation of his federal constitutional rights. We disagree.

### 2. Evidence Code Section 352

Under California law, evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action" (Evid. Code, § 210), and all relevant evidence is admissible except as otherwise provided by statute (Evid. Code, § 351). At issue here, Evidence Code section 352 provides, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

However, "'"[p]rejudice" as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, a section 352 objection should fail. [Citation.] "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, "prejudicial" is not synonymous with "damaging."' [Citation.]" [Citation.] [¶] The prejudice that section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors. [Citation.]' [Citation.]" [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the

49.

emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105; *People v. Tran* (2011) 51 Cal.4th 1040, 1048.)

### 3.      Standard of Review

On appeal, we presume the trial court's evidentiary ruling is correct and defendant bears the burden of demonstrating error.  (*People v. Giordano* (2007) 42 Cal.4th 644, 666; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1139–1140.)  "A trial court has broad discretion to admit or exclude evidence," and we review its ruling for abuse of discretion.  (*People v. Fayed* (2020) 9 Cal.5th 147, 189–190.)

### 4.      Analysis

Luna's relevance argument focuses narrowly on his direct involvement in Francisco's murder, but that was not the only trial issue.  "[A] defendant who commits a felony in furtherance of criminal street gang activity is subject to increased punishment" (*People v. Fuentes* (2016) 1 Cal.5th 218, 223), and there was a gang allegation attached to the murder charge against Luna.  This required the prosecutor to prove, beyond a reasonable doubt, that Francisco's murder was "(1) 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' and (2) 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 331.)  Relevant to that determination, the prosecutor had to prove the existence of a criminal street gang, which "means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually

50.

or collectively engage in, or have engaged in, a pattern of criminal gang activity."
(§ 186.22, subd. (f).)

In addition to satisfying the elements of the gang enhancement, the gang evidence in this case, including the level of Luna's involvement, was relevant to the motive for Francisco's murder. Thus, Luna's argument that the evidence was nothing more than improper propensity evidence is unpersuasive.

The evidence of the methamphetamine was limited in nature. Sergeant Soldado testified that in Luna's Redding apartment, police found a plastic bag with "several individual baggies packaged with methamphetamine" in the living room, along with a backpack containing a bag of methamphetamine in the bedroom. After the court sustained Luna's counsel's objection based on lack of foundation for the conclusion the substance was methamphetamine, the prosecutor asked several questions regarding Soldado's training in identifying methamphetamine. Soldado then testified the substance appeared to be methamphetamine, and the prosecutor introduced one photograph of individually bagged, suspected methamphetamine and one photograph of a digital gram scale located in the apartment. Soldado also testified to factors he relied on to distinguish narcotics for personal use from narcotics for sale and, based on the packaging, the quantity, and the presence of a scale, he opined that the methamphetamine seized from Luna's apartment was possessed for sale.

Soldado's testimony on the subject was brief; the evidence of the methamphetamine was directly relevant to the gang's primary activities, which included drug sales, and to Luna's involvement in gang activities; and it is clear from the record that the prosecutor introduced the evidence for that purpose. Accordingly, we find no error in the trial court's admission of the evidence.

We reach the same conclusion with respect to the jail calls between Luna and Martinez obtained during Operation Scrapbook. The prosecutor represented that Operation Scrapbook netted "months' worth of calls in this case," but by the time of the

hearing on the motions in limine, the prosecution had narrowed the evidence to six calls amounting to approximately 75 minutes, with plans to further edit the calls down to no more than 30 minutes. As stated, the trial court thereafter imposed a 30-minute limit on the calls.

Agent Rochester testified briefly regarding gangs in prison, the structure of the Mexican Mafia and the Sureño subsets at street level, how gangs earn and funnel money, and how cell phones are used to communicate from inside prisons. Rochester also identified Martinez's voice from the wiretapped calls and testified Martinez was a validated Mexican Mafia associate.

Deputy Goncalves was directly involved in three major wiretap investigations. Two targeted the Nuestra Familia prison gang and Merced County-based Norteños, and the third, Operation Scrapbook, targeted the Mexican Mafia and Merced County-based Sureños. Goncalves testified that assaults, murder, and drug sales were among the primary activities of Sureños, which included the WVP and A-Town subsets, and, after the calls were played, Goncalves explained Martinez and Luna were discussing "'setting up shop,'" which referred to trafficking contraband such as cell phones and narcotics; a power struggle between Luna and Juan Gonzalez for control within the jail; and funneling money to Martinez. As well, Martinez and Luna discussed killing an inmate whom Goncalves identified as a former high-ranking member of a Sureño subset who was previously assaulted in jail, and discussed a woman whom Goncalves identified as used by gang members to smuggle drugs into the jail.

This evidence was highly probative of gang structure and primary activities, both relevant to proving the gang enhancement, and it was probative of Luna's deep engagement in gang activities. The prosecution is not required to "forgo the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence," and "cannot be compelled to "'present its

52.

case in the sanitized fashion suggested by the defense.""" (*People v. Tran, supra*, 51 Cal.4th at p. 1049.)

Thus, Luna was not entitled to a presentation of gang evidence stripped to its minimum. (*People v. Tran, supra*, 51 Cal.4th at p. 1049.) This was not a case where the other gang evidence was so substantial that the challenged evidence had only minimal probative value (*People v. Coneal* (2019) 41 Cal.App.5th 951, 967–968), or where the prosecutor was toeing the line of "'over-prov[ing]'" its case (*People v. Williams* (2009) 170 Cal.App.4th 587, 610). Nor did the prosecutor belabor the drug or jail-call evidence during closing argument. Under these circumstances, Luna's claim that the trial court abused its discretion in admitting the calls is unconvincing.

### D.       Substantial Evidence Challenge to Murder Conviction

Finally, Luna claims his murder conviction is not supported by substantial evidence that he either killed Francisco or aided and abetted his murder. We disagree.

#### 1.       Standard of Review

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)). On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 (*Nguyen*).) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*Zamudio, supra*, 43 Cal.4th at p. 357.) "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ....'" (*Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict" *(Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

### 2. Analysis

The jury in this case was instructed on three theories of liability for Francisco's murder: direct commission, aiding and abetting, and uncharged conspiracy. However, the evidence was consistent with the fatal shot coming from the roof, and Fernando testified the shooter was Romo while Sanchez had information that Romo identified Fernando as the shooter. The prosecutor conceded that given these circumstances, there was little evidence Luna was the direct perpetrator, so the prosecution theory focused on aiding and abetting or conspiracy.

Aiding and abetting and uncharged conspiracy are both forms of derivative liability (*People v. Gentile* (2020) 10 Cal.5th 830, 843; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1200, abrogated on another ground by *People v. Rangel, supra*, 62 Cal.4th at p. 1216), and "'as long as each juror is convinced beyond a reasonable doubt that [the] defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty'" (*People v. Scully* (2021) 11 Cal.5th 542, 598; accord, *People v. Chhoun* (2021) 11 Cal.5th 1, 41).

Liability based on aiding and abetting requires the defendant "have knowledge of the direct perpetrator's unlawful purpose; have the intent or purpose of committing, encouraging, or facilitating the commission of the direct perpetrator's offense; and by act or advice aid, promote, encourage, or instigate the commission of that offense." (*In re White* (2020) 9 Cal.5th 455, 464, citing *Nguyen, supra*, 61 Cal.4th at p. 1054.) Liability based on conspiracy is sufficient "'"if [the evidence] supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."'" (*People v. Maciel* (2013) 57 Cal.4th 482, 515–516; accord, *People v. Jurado* (2006) 38 Cal.4th 72, 120.)

Luna argues that the following evidence is insufficient to support his conviction: mere shared gang membership, his presence at the Block that night, his text message to his girlfriend hours after the murder that he was "in some shit," Fernando's testimony that Luna armed himself with a .40-caliber gun and the presence of a .40-caliber magazine in Luna's Redding apartment, and evidence the group armed itself and took lookout positions. Luna also points out Fernando testified there was no plan to kill Francisco and stated Vera and Romo killed Francisco, and he contends there was no motive for him to kill Francisco.

However, Luna's argument requires we consider each piece of evidence individually and isolated from the rest, which is contrary to the applicable standard of review. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Notably, Luna cites to no legal authority supporting his position that the evidence in the record, viewed collectively, fell short of supporting his murder conviction.

"Although motive is normally not an element of any crime that the prosecutor must prove, 'evidence of motive makes the crime understandable and renders the inferences regarding [the] defendant's intent more reasonable.'" (*People v. Riccardi,*

*supra*, 54 Cal.4th at p. 815; accord, *People v. Smith* (2005) 37 Cal.4th 733, 740–741.) In this case, nothing suggested personal problems between Luna and Francisco or Jose prior to the night of the crime, but Luna was a member of Morfin's group and the evidence showed Morfin had ongoing conflict with Jose, did not like Jose or Francisco, and was trying to turn the younger members against them. Some months prior to the shootings, Morfin mentioned Francisco specifically while talking to Fierro about "tak[ing] some homies out," and Jose had already physically fought and bested Morfin three times when Morfin inadvertently wounded Jose's son during a driveby shooting. The jury could have reasonably inferred, as the prosecutor's argument intimated, that Oscar's shooting brought tensions to a head for Morfin, who would expect some consequences. As stated, Luna was part of the younger group led by Morfin and there was evidence that on the night of the murder, Morfin and Luna were both angry when Romo and Vera said Jose and Francisco threatened them with a gun and told them the people at the Block were no good.

Luna was placed at the scene of the murder through Fernando's testimony, a text sent from Denise's phone, and Francisco's statement to Jose that he was going to meet Lazy. As Luna argues in part, "[n]either mere presence at the scene of a crime, nor the failure to take steps to prevent a crime, is alone enough to establish that a person is an aider and abettor." (*People v. Abelino* (2021) 62 Cal.App.5th 563, 578.) However, "[s]uch evidence may … be considered together with other evidence in determining that a person is an aider and abettor." (*Ibid.*) Here, as previously discussed, there is evidence of motive and evidence that Luna lured Francisco to the location. Once Francisco agreed to come, Luna, Morfin, Vera, Romo, Fernando, and Ruben armed themselves with guns. Morfin, Luna, Vera, Romo, and Ruben then positioned themselves outside at lookout points and when Francisco hopped the backed fence, multiple shots were fired at him, with the fatal bullet striking him from behind.

56.

Six hours later, Luna texted his girlfriend to pick him up halfway between Redding and Winton, telling her not to ask but he was "in some shit" and was going to go away for a while. Finally, when Luna was arrested months later, police located a magazine consistent with the gun Fernando said Luna grabbed the night of the murder.

Viewing the record as a whole, the jury was well-entitled to infer that in luring Francisco to the Block that evening, arming themselves with guns, taking up positions in the yard and on the roof, and then ambushing Francisco with gunfire after he jumped the fence, the group, which included Luna, intended to kill. The absence of evidence that Luna and the others *expressly* agreed to kill Francisco or that Luna fired the fatal shot does not undermine Luna's conviction. Substantial evidence supports the jury's determination that Luna committed murder, and we reject his contrary claim.

## II. Morfin's Claims

### A. Sixth Amendment Violation

#### 1. Procedural Background

Detective Sanchez testified during redirect examination that at the time he questioned Vanessa, he was aware there was information that Morfin had admitted to other gang members he shot Oscar. Morfin claims this testimony related multiple layers of hearsay not subject to an exception, its admission violated his rights under the Sixth Amendment, and the resulting prejudice affected all three counts against him, requiring reversal.

In support of his claim of error, Morfin cites to arguments made in his motion for a new trial, filed after he was convicted and argued at the sentencing hearing. However, Morfin does not advance an appellate claim based on erroneous denial of his new trial motion and, therefore, as the People assert, the focus is on the trial court's ruling at the time it was made.[19]

---

[19] In briefing, Morfin mentions *Aranda/Bruton*, which he raised in the trial court in the context of his new trial motion. (*Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*); *People*

The relevant testimony is as follows:

During trial, Vanessa conceded the audio excerpt played from her interview sounded like her voice, but she stated she did not remember the conversation she had with detectives. She testified that she did not tell detectives Oscar's shooting was gang related, she did not recall telling them she saw Oscar's shooter, and she did not know Morfin. She testified that it was detectives who told her Morfin admitted he shot Oscar. She conceded her signature was on the photo lineup, but stated she did not remember it, could not tell if those were her initials on it, and did not remember identifying Morfin.

On cross-examination, Morfin's counsel questioned Vanessa about how she knew of Morfin's arrest, eliciting a reiteration of her testimony that detectives told her he confessed. Counsel then asked the following questions:

> "[MORFIN'S COUNSEL:] Okay. You—you have a vivid memory of them telling you that Arturo Morfin confessed?
>
> "[VANESSA:] "That's what they told me.
>
> "[MORFIN'S COUNSEL:] Yeah. And that was right at the beginning of the conversation that you had with them?
>
> "[VANESSA:] Yes.
>
> "[MORFIN'S COUNSEL:] Yes?
>
> "[VANESSA:]: Yes.

_____

v. _Aranda_ (1965) 63 Cal.2d 518 (_Aranda_).) However, as stated, Morfin does not advance a claim of error based on denial of his new trial motion and he does not advance a claim of _Aranda/Bruton_ error. (See _People v. Brown, supra_, 31 Cal.4th at p. 537, italics omitted ["The _Aranda/Bruton_ rule addresses the situation in which 'an out-of court confession of one defendant … incriminates not only that defendant but another defendant jointly charged [and tried].'"].) As we interpret Morfin's appellate argument, he mentions these issues to show they were raised below and, therefore, his Sixth Amendment claim should not be deemed forfeited. Although the People do contend Morfin's Sixth Amendment claim is forfeited based on his failure to object on Sixth Amendment grounds during trial and any objection raised in the new trial motion was untimely (_People v. Redd_ (2010) 48 Cal.4th 691, 730), because we conclude the trial court did not err in admitting the evidence for a nonhearsay purpose, we need not resolve the forfeiture issue _(People v. McDaniel, supra_, 12 Cal.5th at p. 129).

58.

"[MORFIN'S COUNSEL:] I'm sure before that day you were already pretty frustrated and angry about what had happened to Oscar?

"[VANESSA:] Of course.

"[MORFIN'S COUNSEL:] Yeah. And when you heard that my client had confessed, that was equally frustrating to you, or did it make you angry at him?

"[VANESSA:] I mean, I don't like him.

"[MORFIN'S COUNSEL:] Right. Because the detectives told you he confessed?

"[VANESSA:] Yes.

"[MORFIN'S COUNSEL:] And what if I told you the detective lied to you when they told you?

"[VANESSA:] I pretty much doubt that.

"[MORFIN'S COUNSEL:] You doubt that they would lie to you?

"[VANESSA:] Well, I mean, why would they?

"[MORFIN'S COUNSEL:] That's a good question. [¶] So if I told you no one has ever confessed to the shooting of your son, that would be a surprise?

"[PROSECUTOR:] Objection. Calls for speculation.

"THE COURT: Overruled.

"[VANESSA]: I don't understand this.

"[MORFIN'S COUNSEL:] Would that be a surprise to you?

"[VANESSA:] I'm—I mean, yeah. I guess.

"[MORFIN'S COUNSEL:] You look pretty upset about that.

"[VANESSA:] I'm upset.

"[MORFIN'S COUNSEL:] Yeah. You said on the stand earlier that after the detectives told you that [Morfin] had confessed, that you wanted to do whatever you could to help them put him away.

59.

"[VANESSA:] I said they should do whatever they need to do and put him away, yeah.

"[MORFIN'S COUNSEL:] Okay. Because it seems like to you maybe that would even be enough, that if my client had confessed, that that should be enough to put him away?

"[VANESSA:] Yeah."

A portion of Vanessa's recorded interview was subsequently played for the jury. In the interview, Sanchez told Vanessa that one of the people arrested for Francisco's murder confessed to shooting Oscar, but Sanchez did not identify the person as Morfin or anyone else. Later in the interview, Vanessa selected a photo in the lineup presented and identified the individual as "Arthur."

Erick testified after Vanessa and then Sanchez testified. During Morfin's cross-examination of Sanchez, trial counsel questioned him regarding his interview of Vanessa. In relevant part, counsel asked Sanchez, "Arturo Morfin never told you anything about a shooting of Oscar …?" Sanchez responded, "That's correct." Morfin's counsel then asked, "He never confessed to this at all?" Sanchez replied, "He didn't."

On redirect examination, the prosecutor asked clarifying questions of Sanchez:

"[PROSECUTOR:] Detective Sanchez, you said that Arturo Morfin never confessed. Do you mean he never confessed to you in an interview?

"[SANCHEZ:] That's exactly what I meant.

"[PROSECUTOR:] Okay. Do you know if he confessed to anyone else to shooting Oscar?

"[SANCHEZ:] I personally—

"[MORFIN'S COUNSEL]: Objection. Hearsay.

"THE COURT: I think she's asking not the content of it but whether he's aware of that being done, so overruled.

"[SANCHEZ]: I was aware that he had spoken to other gang members about it, not to me personally.

"[PROSECUTOR:]  So at the point that you went over to interview Vanessa Garcia, it was your understanding that Arturo Morfin had already confessed to other people when you—he had already confessed to other people?

"[SANCHEZ:]  Yes."

## 2.  Analysis

Morfin claims the testimony regarding his confession was admitted for the truth of the matter asserted and assuming his statement qualifies as an admission or a statement against interest, the person to whom he allegedly made that statement did not testify. (Evid. Code, §§ 1200, 1220, 1230.)  Therefore, he argues, admission of the evidence violated his right to confront witnesses.  We are not persuaded.

Sanchez's credibility as the lead detective who interviewed key prosecution witnesses, including Jose, Vanessa, J.V., and Fernando, was one of the areas of focus at trial.  Morfin's counsel attempted to seed doubt around Vanessa's identification of Morfin as Oscar's shooter and Sanchez's credibility by drawing attention to Vanessa's testimony that she was fed the information Morfin was the shooter, asking Vanessa about how she would feel about being lied to by detectives, and eliciting Sanchez's testimony that Morfin did *not* confess to him.  On redirect examination, the prosecutor rehabilitated Sanchez's credibility by clarifying that when he questioned Vanessa and sought her identification of the shooter, he was not lying and had information Morfin had admitted the shooting to other gang members.

The trial court's ruling reflects that it admitted the testimony for a nonhearsay purpose.  (*People v. Montes* (2014) 58 Cal.4th 809, 863; *People v. Perez* (2017) 18 Cal.App.5th 598, 621.)  As previously stated, on appeal, we presume the trial court's evidentiary ruling is correct and the defendant bears the burden of demonstrating error. (*People v. Giordano, supra*, 42 Cal.4th at p. 666; *People v. Anthony, supra*, 32 Cal.App.5th at pp. 1139–1140.)

In an effort to show the testimony was not properly admitted for a nonhearsay purpose, Morfin contends that "the theory the defense opened the door is flawed because the focus of the questioning was that if the detective was providing false information to a witness, that fact could cause the witness to provide false information in return." The record, however, belies this narrow view of the defense's examination of Vanessa and Sanchez.

We conclude Morfin has not met his burden of demonstrating the trial court abused its discretion in admitting the evidence for a nonhearsay purpose. (*People v. McKinnon* (2011) 52 Cal.4th 610, 656 [testimony regarding street gossip admissible for nonhearsay purpose of showing the defendant heard the gossip and it motivated him to commit killing]; *People v. Edwards* (2013) 57 Cal.4th 658, 733 [sergeant's challenged testimony relating to scientific testing admissible for nonhearsay purpose of showing why he did not take further investigatory steps].) This forecloses Morfin's constitutional claim. (*People v. Anderson*, *supra*, 5 Cal.5th at p. 405 ["'[T]here are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes.'"].)

## B.    Sentencing Issues

### 1.    Senate Bill No. 620

Effective January 1, 2018, Senate Bill No. 620 amended sections 12022.5 and 12022.53. Pursuant to those amendments, "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section…." (§§ 12022.5, subd. (c), 12022.53, subd. (h).)

Morfin and Luna were sentenced on February 9, 2018, after the effective date of Senate Bill No. 620. Neither the trial court nor counsel mentioned Senate Bill No. 620 or the existence of newly acquired discretion to strike firearm enhancements. On this basis, Morfin, joined by Luna, argues that the silent record indicates the trial court was unaware

of the scope of its sentencing discretion, necessitating remand to allow the court to exercise discretion concerning imposition of the firearm enhancement. We disagree.

"'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, we have held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; accord, *People v. Flores* (2020) 9 Cal.5th 371, 431–432; *People v. Yanaga* (2020) 58 Cal.App.5th 619, 625.) However, "[i]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361), and ""''error must be affirmatively shown''"" (*People v. Giordano, supra*, 42 Cal.4th at p. 666; see Cal. Rules of Court, rule 4.406(b)(8) [statement of reason generally required if relief *granted* under § 1385]).

Senate Bill No. 620 became effective almost six weeks before Morfin and Luna were sentenced, and nothing in the record reflects the trial court was unaware of the scope of its sentencing discretion. We may not presume error on a silent record, as Morfin acknowledges, and, therefore, Morfin and Luna are not entitled to remand under Senate Bill No 620.[20]

### 2. Imposition of Firearm Enhancement on Count 1

Next, Morfin, joined by Luna, argues that imposition of an additional 25 years to life under section 12022.53 on count 1 constitutes improper multiple punishment for the

---

[20] As a practical matter, Morfin's request for remand under Senate Bill No. 620 is rendered moot given his entitlement to remand under Senate Bill No. 1393 and the sentencing error on count 2 requiring correction, discussed *post*.

same criminal act, in violation of the double jeopardy clause. Morfin acknowledges that his claim is foreclosed under California Supreme Court precedent and that those decisions are binding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, he raises the issue to preserve it for later review. (*People v. Jaramillo* (1993) 20 Cal.App.4th 196, 198–199.) We reject the claim, as follows.

"The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed 'in jeopardy' for the 'same offense,'" and, relevant here, "'protects against multiple punishment for the same offense.'" (*People v. Anderson* (2009) 47 Cal.4th 92, 103–104.) Morfin and Luna acknowledge that "[c]umulative punishment may be imposed under two statutes if the Legislature has authorized such punishment," but they urge that "section 12022.53, subdivision (d), should not be interpreted as a legislative exception to … section 654 in murder cases because it is not a legislative determination that there should be additional punishment for the firearm."

"'[T]he [Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense … [citations] … *and then only when such occurs in successive proceedings*, [citation].'" (*People v. Sloan* (2007) 42 Cal.4th 110, 121.) The claim advanced here by Morfin and Luna pertains to an enhancement, rather than an offense, found true beyond a reasonable doubt in a unitary trial; neither the double jeopardy clause nor the concerns underlying *Apprendi*,[21] also cited by Morfin and Luna, are applicable. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1130; *People v. Izaguirre, supra*, 42 Cal.4th at p. 134; *People v. Sloan, supra*, at pp. 121–123.) To the

---

[21] *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Thus, under *Apprendi*, the trier of fact must have found the firearm enhancement true beyond a reasonable doubt. (*People v. Izaguirre* (2007) 42 Cal.4th 126, 134; *People v. Sloan, supra*, 42 Cal.4th at pp. 122-123.) It did so.

contrary, "[f]ederal law, like California statutory law, clearly recognizes that cumulative punishment may be imposed under two statutes, even where they proscribe the same conduct, if the Legislature has specifically authorized cumulative punishment" (*People v. Sloan, supra*, at p. 121), and as discussed next, the Legislature provided for the addition of a sentence enhancement if a firearm is used in the commission of certain enumerated felonies, including murder (§ 12022.53, subd. (d)).[22]

Under section 654, subdivision (a), "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision…."[23] Section 654 *may* apply, by default, to sentence enhancements (*People v. Ahmed* (2011) 53 Cal.4th 156, 165), and "when applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act" (*id.* at p. 164). Notably, "[i]f section 654 barred *any* additional punishment for a single criminal act, then no enhancement at all would be permitted, a result obviously inconsistent with the function of sentence enhancements." (*Ibid.*)

However, as stated, section 654 applies only by default and "[o]ften the sentencing statutes themselves will supply the answer whether multiple enhancements can be imposed." (*People v. Ahmed, supra*, 53 Cal.4th at p. 163.) "When this is the situation,

---

[22] The Legislature recently amended section 1385. (Sen. Bill No. 81 (2021-2022 Reg. Sess.) ch. 721, § 1, pp. 1–3 (Senate Bill No. 81 or Sen. Bill No. 81).) Effective January 1, 2022, and applicable to sentencings occurring after the effective date, section 1385 provides that "[n]otwithstanding any other law, the court *shall* dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1), (7), italics added, as amended by Sen. Bill No. 81.)

[23] As amended by Assembly Bill No. 518 and effective January 1, 2022, section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

recourse to section 654 will be unnecessary because a specific statute prevails over a more general one relating to the same subject. [Citation.] The court should simply apply the answer found in the specific statutes and not consider the more general section 654. [¶] Only if the specific statutes do not provide the answer should the court turn to section 654." (*Ibid.*)

Here, section 12022.53 controls. "[S]ection 12022.53 was enacted to ensure that defendants who use a gun remain in prison for the longest time possible" (*People v. Gonzalez, supra*, 43 Cal.4th at p. 1129), and "the Legislature made clear that it intended to create a sentencing scheme unfettered by section 654," choosing "to limit enhancements based on the *crimes* committed rather than an analysis of individual *acts* as called for in section 654" (*People v. Palacios* (2007) 41 Cal.4th 720, 732). Although the trial court had the discretion to strike the firearm enhancement in the interest of justice (§ 12022.53, subd. (h)), the statute authorized the imposition of an additional, consecutive sentence of 25 years to life for murder where the personal and intentional discharge of a firearm proximately caused death (§ 12022.53, subds. (a)(1), (d)).[24] Therefore, as Morfin and Luna concede, their claim of improper double punishment is foreclosed under the law.

### 3. Senate Bill No. 1393

Next, effective January 1, 2019, Senate Bill No. 1393 amended former sections 667, subdivision (a)(1), and 1385, subdivision (b), to grant trial courts discretion to strike prior serious felony conviction enhancements. Morfin seeks remand to allow the trial court to exercise its discretion under Senate Bill No. 1393, and if the court declines to strike the enhancement, he requests his sentence be corrected to reflect five years rather than the 10 years imposed on count 2, discussed *post*. The People concede Morfin

---

[24] The enhancement applies to principals in the commission of an offense where "[t]he person violated subdivision (b) of Section 186.22," and "[a]ny principal in the offense committed any act specified in subdivision (b), (c), or (d)." (§ 12022.53, subd. (e)(1)(A), (B).)

is entitled to remand under Senate Bill No. 1393 and to correction of the enhancement term should the court decline to strike the enhancement.

At the time Morfin was sentenced, imposition of the prior serious felony conviction enhancement was mandatory. Senate Bill No. 1393 applies retroactively to this case (*People v. Stamps* (2020) 9 Cal.5th 685, 699), and nothing in the record suggests remand would be futile (*People v. Flores, supra*, 9 Cal.5th at p. 432). Therefore, Morfin is entitled to remand so the trial court may determine whether to strike the prior serious felony conviction enhancement. (§ 1385.)[25]

### 4. Other Sentencing Issues

Finally, Morfin and the People agree that on count 2, the trial court improperly imposed 10 years for the prior serious felony conviction enhancement under section 667, subdivision (a)(1), rather than five years. Additionally, we observe several other issues not raised by the parties on review or in the trial court. Errors that result in an unauthorized sentence "are reviewable 'regardless of whether an objection or argument was raised in the trial and/or reviewing court.'" (*People v. Smith* (2001) 24 Cal.4th 849, 852; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 716.) Accordingly, on remand pursuant to Senate Bill No. 1393, the trial court shall address, as is necessary, the following errors.

We start first with a sentencing error not raised by the parties because correction of the error is required on remand. On count 2, the jury convicted Morfin of shooting at an occupied vehicle, in violation of section 246, and found true the firearm enhancement under section 12022.53, subdivision (d), and the gang enhancement under section 186.22, subdivision (b)(4). The trial court sentenced Morfin as follows: the upper term of seven years under section 246, doubled to 14 years for the prior strike conviction; 25 years to

---

[25] As discussed next, Morfin must be resentenced on count 2. We again acknowledge Senate Bill No. 81, effective January 1, 2022, but express no view on its effect, as those issues should be considered in the first instance by the trial court and the parties on remand.

67.

life for the firearm enhancement under section 12022.53, subdivision (d); 15 years to life for the gang enhancement under section 186.22, subdivision (b)(4)(B); and five years for the prior serous felony conviction enhancement under section 667, subdivision (a). The court then summarized the sentence as a determinate term of 24 years and an indeterminate term of 65 years.

Section 186.22, subdivision (b)(4), is an alternate penalty provision rather than an enhancement added to the base term, and application of the penalty provision was triggered by Morfin's conviction for violating section 246 and the jury's gang allegation finding. (*People v. Jones* (2009) 47 Cal.4th 566, 575–576.) Therefore, the trial court erred in sentencing Morfin under both section 246 and section 186.22, subdivision (b)(4)(B). On remand, Morfin's sentence on count 2 must be recalculated in accordance with the alternate penalty provision under section 186.22, subdivision (b)(4). (*People v. Jones*, *supra*, at pp. 575–578; *People v. Sok* (2010) 181 Cal.App.4th 88, 96–99.)

Next, at the time of sentencing, the trial court lacked the discretion to strike the prior serious felony conviction enhancement under section 667, subdivision (a)(1). The court added the five-year enhancement to the determinate terms imposed on count 2 and on count 3. Additionally, on count 2, the court described the determinate portion of the term as 24 years, although it is unclear if the court misspoke or if, as the parties suggest, it doubled the enhancement to 10 years. As to determinate terms, which are governed by section 1170.1, the prior serious felony conviction enhancement is not added to each count but is "'instead … added just once as the final step in computing the total sentence'" (*People v. Sasser* (2015) 61 Cal.4th 1, 16), and it is not doubled (*People v. Sok, supra*, 181 Cal.App.4th at pp. 93–94). Indeterminate terms are not governed by section 1170.1, and the enhancement is added separately to each indeterminate term. (*People v. Williams* (2004) 34 Cal.4th 397, 404–405; *People v. Misa* (2006) 140 Cal.App.4th 837, 845–847.) Thus, at the time of sentencing, the court erred in its imposition of the prior serious felony conviction enhancements. However, the trial court

68.

must resentence Morfin on count 2 after remittitur issues in this case, which is unlikely to occur prior to the effective date of Senate Bill No. 81 on January 1, 2022.  We leave the effect on Morfin's sentence from the changes to section 1385, or any other relevant change the parties may elect to raise, for the trial court and the parties to consider in the first instance.

## DISPOSITION

Luna's judgment is affirmed.

As to Morfin, the trial court's prior prison term enhancement finding is stricken in accordance with Senate Bill No. 136, and this matter is remanded under Senate Bill No. 1393 and for resentencing on count 2, as addressed in parts II.B.3. and 4. of the Discussion.  Following resentencing, the trial court shall forward an amended abstract of judgment to the appropriate authorities.  Morfin's judgment is otherwise affirmed.


MEEHAN, J.

WE CONCUR:


PEÑA, ACTING P. J.


DeSANTOS, J.